IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane )
Doe 4, Jane Doe 5, Jane Doe 6, Jane Doe 7, )       **C.A. No.  6:22-2957-HMH**
John Doe 1, John Doe 2, and John and Jane )
Does 1-100, )                                       **OPINION & ORDER**
            Plaintiffs, )
 )
     vs. )
 )
Varsity Brands, LLC; Varsity Spirit, LLC; )
Varsity Brands Holding Company, Inc.; )
U.S. All Star Federation; USA Federation )
of Sport Cheering d/b/a USA Cheer; Jeff )
Webb; Charlesbank Capital Partners, LP; )
Bain Capital, LP; Rockstar Cheer & Dance, )
Inc.; Katherine Anne Foster, *as the personal* )
*representative of the Estate of Scott Foster*; )
Kathy Foster, *individually*; Kenny Feeley; )
Josh Guyton; Nathan Allan Plank; )
Christopher Hinton; Tracy a/k/a or f/k/a )
Traevon Black; Peter Holley; and other )
Unknown Defendants, )
 )
           Defendants. )

      Before the court are two motions to dismiss Plaintiffs' amended complaint under Federal

Rule of Civil Procedure 12(b)(6) – one filed by Defendants Varsity Brands, LLC ("Varsity

Brands") and Varsity Brands Holding Company, Inc. ("Varsity Holding") and the other filed by

Defendant Varsity Spirit, LLC ("Varsity Spirit").[1]  For the reasons below, the court grants in part

and denies in part the Varsity Defendants' motions.

---

     [1] The court refers to Varsity Brands, Varsity Holding, and Varsity Spirit collectively as
"Varsity" or the "Varsity Defendants."

## I. BACKGROUND

Plaintiffs are nine former youth cheerleaders who allege that they were sexually abused by coaches employed by Defendant Rockstar Cheer & Dance, Inc. ("Rockstar Cheer"), a cheerleading gym affiliated with the Varsity Defendants.  In addition to pursuing claims against the individual coaches and Rockstar Cheer, Plaintiffs seek to hold Varsity, Jeff Webb ("Webb"), Bain Capital, LP ("Bain"), Charlesbank Capital Partners, LP ("Charlesbank"), and competitive cheerleading's governing bodies – USA Federation of Sport Cheering ("USA Cheer") and U.S. All Star Federation ("USASF") – liable for misrepresenting the safety of Varsity gyms and competitions and failing to adopt and enforce adequate athlete-safety policies and procedures. The facts below are taken from Plaintiffs' amended complaint and are accepted as true for purposes of the present motion.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).[2]

### A. Overview of All Star Cheerleading

Unlike traditional sideline cheerleading, All Star cheerleading is a competition-based sport unto itself.  (Am. Compl. ¶¶ 42-43, ECF No. 8.)  All Star cheer teams compete by performing two-and-a-half minute routines set to music, which incorporate elements of tumbling, stunting, cheer, and dance.  (Id. ¶ 42, ECF No. 8.)  According to Plaintiffs, over four million athletes across the United States participate in All Star cheerleading at some level, with many training and competing year-round.  (Id. ¶ 44, 46, ECF No. 8.)  This level of commitment is expensive: a single season costs anywhere from $3,000 to $7,000 per athlete, while some

_____

[2] This case is one of four cases before the court involving similar allegations of sexual assault and essentially the same defendants.  6:22-cv-03508-HMH; 6:22-cv-03509-HMH; 6:22-cv-03510-HMH.  The Varsity Defendants have moved to dismiss the other three cases as well. Those motions will be addressed in separate orders.

families spend more than $20,000 a year for transportation, lodging, membership fees, merchandise, and uniforms.  (Id. ¶ 45, ECF No. 8.)

The beginnings of the competitive cheerleading industry can be traced to Webb's founding of the predecessor to Varsity Spirit in 1974.  (Id. ¶ 80, ECF No. 8.)  Varsity Spirit began as a provider of educational training camps for cheerleaders and has since expanded into selling uniforms and apparel and organizing cheer competitions.  (Am. Compl. ¶ 81, ECF No. 8.)  It now controls an estimated 80-90% of the All Star cheer market.  (Id. ¶ 49, ECF No. 8.)  From 2014 to 2018, Varsity was wholly owned by Charlesbank, a Boston-based company.  (Id. ¶¶ 38, 107, ECF No. 8.)  Today, Varsity is owned by another Boston-based company – Bain – which purchased Varsity in 2018 for $2.5 billion.[3]  (Id. ¶¶ 39, 109, ECF No. 8.)

Two governing bodies oversee competitive cheerleading in the United States: USASF and USA Cheer.  (Id. ¶¶ 86, 89, ECF No. 8.)  Plaintiffs maintain that Varsity was heavily involved in creating and operating both organizations.  For example, Varsity allegedly advanced a $1.8 million interest-free loan to help launch USASF, submitted USASF's trademark application, and for at least fifteen years, housed USASF's offices at its corporate address and paid USASF's employees directly.  (Am. Compl. ¶¶ 85, 96-98, ECF No. 8.)  Varsity also continues to control a majority of the seats on USASF's board of directors, including all seats with voting rights.  (Id. ¶ 99, ECF No. 8.)  Similar to USASF, USA Cheer was purportedly created in 2007 with the help of an interest-free loan from Varsity, listed "Varsity's Tennessee

---

[3] At the same time, Plaintiffs allege that "Charlesbank made a new investment in Varsity alongside . . . Bain and retained a minority stake in the business."  (Am. Compl. ¶ 109, ECF No. 8.)

headquarters as its own," and at one time had six Varsity employees on its board.  (Id. ¶¶ 89, 91, 103, ECF No. 8.)

As a result of Webb's and Varsity's ties to cheerleading's governing bodies, Plaintiffs contend, Webb and Varsity "were entirely self-regulated" and could control "all aspects of All-Star cheer."  (Id. ¶¶ 82, 95, ECF No. 8.)  As examples, Plaintiffs point out that:

- All Star athletes must buy a USASF membership to compete at Varsity events.  (Id. ¶ 51, ECF No. 8.)

- All Star athletes are required to pay annual or monthly dues to Varsity and their local Varsity-affiliated gym for "competition attendance, uniforms, accessories, and other related fees."  (Am. Compl. ¶ 56, ECF No. 8.)

- "Gyms and coaches likewise pay monthly or annual fees to USASF, USA Cheer and the Varsity Defendants."  (Id. ¶ 57, ECF No. 8.)

- Affiliate gyms are required "to sign multi-year supply contracts whereby the gyms are paid cash rebates from Varsity for buying [its] merchandise and for sending the gym's athletes to Varsity events."  (Id. ¶ 54, ECF No. 8.)

- "[M]embership in USASF[] and with a Varsity-affiliated gym mandates competing in a specified number of annual [V]arsity events."  (Id. ¶ 59, ECF No. 8.)

- Athletes and their families must purchase rooms at Varsity-selected hotels while at Varsity competitions; the failure to do so "subjects the athlete to disqualification."  (Id. ¶ 61, ECF No. 8.)

### B. Scott Foster and the Rockstar Cheer Gym

Defendant Scott Foster cheered collegiately at the University of Louisville, "a pre-eminent [sic] name in the world of competitive cheerleading," and began coaching youth cheerleaders in Kentucky in 1996.  (Am. Compl. ¶¶ 134-35, ECF No. 8.)  Shortly after moving to Greenville, South Carolina, in 1999, Scott Foster opened an All Star cheer gym together with his wife, Defendant Kathy Foster.  (Id. ¶ 137, ECF No. 8.)  The couple at one point also operated World Spirit Federation, a competition cheerleading company, before selling the company to

Varsity Brands in 2006.  (Id. ¶ 138, ECF No. 8.)  A year later, in 2007, Scott and Kathy Foster

opened Rockstar Cheer in Greenville.  (Id. ¶ 139, ECF No. 8.)  Rockstar Cheer's stated mission

was "[t]o provide a structured environment of competitive cheerleading while accomplishing

our goals [and] to teach dedication, commitment, self-confidence, teamwork, discipline,

responsibility, and leadership in a family-friendly, safe and fun environment."  (Id. ¶ 140, ECF

No. 8.)  To this end, USASF certified Rockstar Cheer "as meeting All-Star standards with

respect to coach credentials, program quality, and athlete safety."  (Am. Compl. ¶ 141, ECF

No. 8.)  According to Plaintiffs, this meant that USASF "warrant[ed] that [Rockstar Cheer], its

coaches, and its choreographers were deemed safe, and that the gym followed best practices

related to athlete safety."  (Id. ¶ 53, ECF No. 1.)

    In 2018, one of Rockstar Cheer's teams, Beatles, won Varsity's World Championship

title.  (Id. ¶ 144, ECF No. 8.)  This accomplishment "further elevated Rockstar's status" and

allowed Scott and Kathy Foster "to recruit athletes nationwide."  (Id. ¶¶ 143-44, ECF No. 8.)

### C. Plaintiffs' Allegations of Abuse

#### 1. John Doe 1

    John Doe 1 began cheering for an All Star team in California while in the sixth grade.

(Id. ¶ 201, ECF No. 8.)  In 2017, he joined a "Level 4 BlackJacks team" after moving to Las

Vegas.  (Am. Compl. ¶ 203, ECF No. 8.)  John Doe 1 first learned of Scott Foster around this

time through Foster's "reputation in the [Varsity] community" and his social media presence.

(Id. ¶¶ 205-06, ECF No. 8.)  After John Doe 1 followed Foster on social media, Foster followed

John Doe 1 back and began sending him direct messages.  (Id. ¶¶ 207, 209, ECF No. 8.)  The

two exchanged direct messages for about a month leading up to a Varsity tournament in 2019 in

which John Doe 1 was to compete.  (Id. ¶ 210, ECF No. 8.)  At some point, Foster asked John

Doe 1 for his cell phone number and later text messaged him about meeting at the tournament. (Id. ¶ 210, ECF No. 8.)  John Doe 1 – who was sixteen at the time – understood from the "tone and tenor of the communications" that Foster was soliciting him to engage in sexual conduct. (Am. Compl. ¶¶ 211, 221, ECF No. 8.)  John Doe 1 "felt uncomfortable with the exchange but also felt uncomfortable ceasing communications with such an important figure in the competitive cheer community."  (Id. ¶ 212, ECF No. 8.)  John Doe 1 and Foster allegedly exchanged nude photographs of themselves and "had their first sexual encounter" at the tournament.  (Id. ¶¶ 213-14, 218, ECF No. 8.)  John Doe 1 asserts that they had a second sexual encounter in May 2019 at another Varsity tournament where Foster performed oral sex on and received oral sex from John Doe 1.  (Id. ¶¶ 219-20, ECF No. 8.)

### 2. John Doe 2

John Doe 2 began cheering around 2013 when he was in the eighth grade.  (Id. ¶ 228, ECF No. 8.)  He joined Rockstar after moving to Greenville in 2014.  (Am. Compl. ¶ 229, ECF No. 8.)  Almost immediately, Defendants Tracy a/k/a or f/k/a Traevon Black ("Black") and Peter Holley ("Holley") allegedly "began making inappropriate and vulgar comments to him."  (Id. ¶ 230, ECF No. 8.)  When he was sixteen, John Doe 2 claims that he was pressured into sending nude photographs to Black and Holley.  (Id. ¶¶ 231-32, ECF No. 8.)  John Doe 2 also claims that he was pressured into going to the "Rockstar house" – a house paid for by Scott and Kathy Foster where Rockstar coaches "host[ed] parties, d[id] drugs, and dr[a]nk alcohol with the minor athletes."  (Id. ¶¶ 234, 236, ECF No. 8.)  One time, John Doe 2 went to the Rockstar house at the request of an unidentified coach who purportedly "tried to engage in oral sex" with John Doe 2 and forced him to watch pornographic videos.  (Id. ¶ 237, ECF No. 8.)  John Doe 2 also asserts that another unnamed Rockstar coach, "who was at least twice Plaintiff

6

John Doe 2's age," invited him over to the Rockstar house and offered him marijuana and alcohol. (Am. Compl. ¶ 239, ECF No. 8.) John Doe 2 maintains that Scott and Kathy Foster knew about and condoned this behavior and that it "was actually encouraged as a way of ensuring that the athletes remained at Rockstar." (Id. ¶ 240, ECF No. 8.)

### 3. Jane Doe 1

Jane Doe 1 began cheering for the Carolina All-Stars while in the seventh grade. (Id. ¶ 244, ECF No. 8.) When she was fifteen, she was placed on Scott Foster's team. (Id. ¶ 245, ECF No. 8.) Jane Doe 1 claims that Foster "immediately began grooming her." (Id. ¶ 246, ECF No. 8.) For example, she alleges that Foster would spend "hours talking to her about other athletes' sex lives" and asked whether she had "any interest in engaging in certain sexual activity, including anal sex." (Am. Compl. ¶ 246, ECF No. 8.) Jane Doe 1 states that these discussions made her "extremely uncomfortable, but at the same time created an artificial sense of closeness with . . . Foster." (Id. ¶ 246, ECF No. 8.) When Jane Doe 1 was seventeen, Foster offered to use his connections with the University of Louisville to help with her recruitment. (Id. ¶ 247, ECF No. 8.) Accordingly, Jane Doe 1 traveled with Scott and Kathy Foster to one Varsity tournament a day early to visit the University of Louisville. (Id. ¶ 248, ECF No. 8.) Upon arriving at the team hotel, Jane Doe 1 realized she forgot a toothbrush, so she called Scott Foster, who brought one to her room. (Id. ¶ 249, ECF No. 8.) She claims that Foster then sat on her bed and made a sexual advance toward her. (Am. Compl. ¶ 249, ECF No. 8.)

### 4. Jane Doe 2

Jane Doe 2 started cheering when she was five years old. (Id. ¶ 251, ECF No. 8.) While at Varsity's World Championship Event during the 2018 season, then fifteen-year-old Jane Doe 2 was introduced to an unidentified male coach who "repeatedly attempted to force [her] to

engage in sexual acts," even though "she was clearly underage" and "repeatedly told him no." (Id. ¶¶ 252-53, ECF No. 8.)  Jane Doe 2 began competing for Rockstar in 2019 while commuting from her home in North Carolina.  (Id. ¶ 255, ECF No. 8.)  During one of her first Rockstar practices, she trained with Scott Foster, "who complimented her on her looks, and began almost immediately to touch her inappropriately."  (Id. ¶ 256, ECF No. 8.)  Jane Doe 2 also spent the night at Foster's house twice in the following months at his invitation; each time, she alleges, Foster gave her "drugs and alcohol."  (Am. Compl. ¶ 257, ECF No. 8.)  Jane Doe 2 further alleges that she "was provided alcohol and drugs on numerous occasions while she cheered with Rockstar, including during competitions hosted by the Varsity Defendants and overseen by . . . USASF."  (Id. ¶ 258, ECF No. 8.)  She specifically "recalls going to a party with other athletes at the penthouse of one of the Varsity-selected hotels" where she drank alcohol with Foster.  (Id. ¶ 259, ECF No. 8.)  Jane Doe 2 states that this culture of alcohol and drug use "created an environment where the athletes' inhibitions were down" and "created a sense of sexual availability between the adult coaches and the child-athletes."  (Id. ¶ 260, ECF No. 8.)

### 5. Jane Doe 3

Jane Doe 3 started cheering for the Carolina All Stars at the age of nine.  (Id. ¶ 267, ECF No. 8.)  Scott Foster became her coach when she was eleven years old.  (Am. Compl. ¶ 268, ECF No. 8.)  During one cheer competition when she was sixteen years old, Foster assigned Jane Doe 3 to share a room with multiple people, including an adult coach, Defendant Kenny Feeley ("Feeley").  (Id. ¶¶ 271-72, ECF No. 8.)  She alleges that Feeley climbed into her bed, "groped and fondled her, and digitally penetrated her."  (Id. ¶ 272, ECF No. 8.)  Sometime later, Foster arranged for Jane Doe 3 to receive private training from Feeley.  (Id. ¶ 273, ECF No. 8.)  But rather than provide instruction, Feeley allegedly took Jane Doe 3 to his apartment and

8

supplied her with alcohol and marijuana, before taking her to another location and raping her. (Id. ¶ 274, ECF No. 8.)  Jane Doe 3 states that Foster would make comments about the alleged rape while at practice, "insinuating that [he] knew what happened."  (Am. Compl. ¶ 276, ECF No. 8.)  Jane Doe 3 ultimately quit cheerleading because of these incidents.  (Id. ¶ 275, ECF No. 8.)  While she was still cheering, however, she often spent time at Scott and Kathy Foster's home, "where they would all get in a hot tub together and the Fosters would provide [her] with alcohol."  (Id. ¶ 278, ECF No. 8.)  "Jane Doe 3 also recalls parties that took place at the Varsity competitions where she and the other young athletes were given alcohol."  (Id. ¶ 279, ECF No. 8.)

### 6. Jane Doe 4

Jane Doe 4 began cheering when she was nine years old.  (Id. ¶ 281, ECF No. 8.)  In 2019, when she was eighteen, "she left her smaller gym in Alabama to try out for Rockstar." (Am. Compl. ¶ 282, ECF No. 8.)  Jane Doe 4 was placed on a "Worlds' level team" and attended her first competition on behalf of Rockstar – Varsity's Battle Under the Bigtop – in December 2019.  (Id. ¶¶ 285-86, ECF No. 8.)  Jane Doe 4 states that after the first day of the competition, Scott Foster invited her to his hotel room and served her alcohol.  (Id. ¶ 288, ECF No. 8.)  Jane Doe 4 additionally claims that Foster and other Rockstar coaches provided her and other athletes with alcohol on the last night of competition.  (Id. ¶ 289, ECF No. 8.)  That same night, Jane Doe 4 alleges that Foster kissed her in a stairwell while the two were going outside to smoke a cigarette.  (Id. ¶ 290, ECF No. 8.)  Within a few months after the tournament, Foster and Jane Doe 4 "were seeing one another several times a week."  (Am. Compl. ¶ 291, ECF No. 8.)  Foster regularly served her alcohol and solicited sex from her, often while they were staying at hotels for Varsity competitions.  (Id. ¶ 292, ECF No. 8.)  Jane Doe 4 later started

working for Foster at some point and, during this time, "felt that she could not deny Defendant

Foster sex, or she would be punished professionally." (Id. ¶¶ 293, 298, ECF No. 8.)  For

example, she alleges that Foster once threatened to change her employment status from salaried

to hourly after she declined to travel out of town with him.  (Id. ¶ 293, ECF No. 8.)

### 7. Jane Doe 5

Jane Doe 5 cheered for Rockstar as a fifteen-year-old.  (Id. ¶ 299, ECF No. 8.)  She

alleges that Defendant Josh Guyton ("Guyton"), a "co-ed stunter and tumbling coach," often

touched her inappropriately during practice.  (Am. Compl.  ¶¶ 300-01, ECF No. 8.)  Guyton

once purportedly "put his hands on Jane Doe 5's upper thighs and questioned her about whether

she shaved her bikini area."  (Id. ¶ 301, ECF No. 8.)  Guyton also often invited Jane Doe 5 to his

apartment across from the gym "so that she could work on her homework in a quiet place

nearby."  (Id. ¶ 302, ECF No. 8.)  On one occasion when Jane Doe 5 was at his apartment,

Guyton allegedly "lured Jane Doe 5 to his bedroom where he proceeded to touch [her] in a

sexual and inappropriate way, tickling her and attempting to 'cuddle' her."  (Id. ¶ 303, ECF No.

8.)  Jane Doe 5 states that this "predatory, grooming behavior" was "so normalized and so

frequent" that it was not until she confided in her mother about Guyton's conduct that she

"recognized it as abuse."  (Id. ¶ 304, ECF No. 8.)

### 8. Jane Doe 6

Jane Doe 6 met Scott Foster when she was eighteen years old.  (Am. Compl. ¶ 306, ECF

No. 8.)  After meeting Foster, she was invited to attend a cheer skills camp in Miami, Florida.

(Id. ¶ 307, ECF No. 8.)  One night during the trip, she claims that Foster gave her "a capful of

liquid" he called "G," which according to Foster, was "a substance used by body builders to

make them look more muscular before a competition."  (Id. ¶¶ 307-08, ECF No. 8.)  Foster then

purportedly "took [her] to a nightclub, where they spent time in a VIP section."  (Id. ¶ 309, ECF
No. 8.)  Jane Doe 6 has "limited memory" of what happened next and was told by teammates
that "she passed out on the couch in the VIP section, vomited on several occasions in several
locations, and had to be showered."  (Id. ¶¶ 311-12, ECF No. 8.)  Jane Doe 6 also claims that
Foster forced her to drink "a half-capful of 'G'" another night during the trip.  (Am. Compl.
¶ 313, ECF No. 8.)  After drinking the liquid the second time, she "sat down on a hotel bed and
thereafter has no further memory from the evening."  (Id. ¶ 313, ECF No. 8.)  Jane Doe 6 now
speculates that the liquid that Foster gave her was GHB or gamma-hydroxybutyrate – more
commonly known as the "date rape drug."  (Id. ¶ 314, ECF No. 8.)

### 9. Jane Doe 7

Jane Doe 7 began cheering for Rockstar when she was thirteen years old.  (Id. ¶ 317,
ECF No. 8.)  During her time at Rockstar, she states that she "witnessed a culture of rampant
drug use, underage alcohol consumption, sexual harassment and abuse."  (Id. ¶ 318, ECF No. 8.)
Jane Doe 7 was coached by Kathy Foster, who purportedly "withh[e]ld[] water from athletes"
during training and subjected them to "excessive physical punishment and conditioning,"
"verbal abuse," "bullying," and "body shaming."  (Am. Compl. ¶ 320, ECF No. 8.)  Jane Doe 7
also alleges that she was sexually abused by two Rockstar coaches – Defendants Nathan Allan
Plank ("Plank") and Christopher Hinton ("Hinton").  Jane Doe 7 claims that Plank, a twenty-
four-year-old adult, "often grope[d] and touch[ed] [her] in an inappropriate way during stunting"
and sent her multiple unsolicited nude photographs and videos of himself masturbating.  (Id.
¶¶ 322-27, ECF No. 8.)  Jane Doe 7 felt "powerless" to stop Plank's behavior, "for fear that she
would be demoted in the program or otherwise punished in a way that would negatively impact
her cheer career."  (Id. ¶ 328, ECF No. 8.)

11

When Jane Doe 7 was fourteen, she was approached by twenty-five-year-old Hinton. (Id. ¶ 329, ECF No. 8.) Hinton persuaded Jane Doe 7 to watch a movie with him one night, during which he questioned her about her sex life. (Id. ¶ 330, ECF No. 8.) "Jane Doe 7 recalls feeling uncomfortable, but conflicted as to how to respond" since she saw him "as an authority figure in the gym, a coach[,] and a person with a large social media presence and following." (Am. Compl. ¶ 330, ECF No. 8.) The same night, Hinton allegedly "forced Jane Doe 7 to perform oral sex on him." (Id. ¶ 331, ECF No. 8.) Jane Doe 7 was initially hesitant to report what happened yet eventually told her mother and sought counseling. (Id. ¶¶ 332-33, ECF No. 8.) Her mother reported the alleged abuse to the Greenville County Sheriff's Department as well as to USASF and Varsity. (Id. ¶ 334, ECF No. 8.) Jane Doe 7 maintains that her mother's complaints "were dismissed as an attempt to manipulate her daughter's position on the cheer team" and that her mother "was told that if she did not like what she was seeing or experiencing at Rockstar, she could 'find another gym.'" (Id. ¶ 335, ECF No. 8.) Jane Doe 7 ultimately quit cheerleading because of these incidents and continues to suffer from anxiety, depression, and PTSD. (Am. Compl. ¶¶ 336-37, ECF No. 8.)

### D. Procedural History

Plaintiffs filed their amended complaint on September 15, 2022. Against Varsity, Plaintiffs assert statutory claims under the Child Abuse Victims' Rights Act of 1986 ("CAVRA"), 18 U.S.C. § 2255; the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d); and the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C. Code Ann. § 39-5-20, in addition to common-law claims for gross negligence, negligent supervision, breach of contract, unjust enrichment, fraud, negligent security, and civil conspiracy. (Am. Compl, ECF No. 8.)

12

On December 19, 2022, the Varsity Defendants moved to dismiss all claims asserted against them for failure to state a claim under Rule 12(b)(6).  (Varsity Brands & Varsity Holding Mot. Dismiss, ECF No. 98); (Varsity Spirit Mot. Dismiss, ECF No. 101.)  Plaintiffs responded in opposition to both motions on January 18, 2023.  (Resp. Opp'n Varsity Brands & Varsity Holding Mot. Dismiss, ECF No. 120); (Resp. Opp'n Varsity Spirit Mot. Dismiss, ECF No. 119). The Varsity Defendants then filed their replies on February 2, 2023.[4]  (Varsity Brands & Varsity Holding Reply, ECF No. 142); (Varsity Spirit Reply, ECF No. 138.)  This matter is now ripe for decision.[5]

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  This plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  (citing Twombly, 550 U.S. at 556).  "'[D]etailed factual allegations'" are not required, but the plaintiff must present "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  Id. (quoting Twombly, 550 U.S. at 555).  In reviewing the complaint, the court "must accept the

---

[4] On March 1, 2023, Plaintiffs in the instant case filed a motion before the United States Judicial Panel on Multidistrict Litigation seeking to transfer all related, pending civil actions filed in districts throughout the United States. See Motion to Transfer, In re Varsity Spirit Athlete Abuse Litig., MDL No. 3077, ECF No. 1. The motion to transfer was denied on June 5, 2023. In re Varsity Spirit Athlete Abuse Litig., MDL No. 3077, 2023 WL 3828645 (J.P.M.L. June 5, 2023).

[5] Under Local Rule of Civil Procedure 7.08, the court may decide motions without a hearing.

factual allegations of the complaint as true and construe them in the light most favorable to the nonmoving party."  Rockville Cars, LLC v. City of Rockville, 891 F.3d 141, 145 (4th Cir. 2018).

### III. DISCUSSION

The Varsity Defendants have moved to dismiss all ten counts asserted against them for failure to state a claim.  The court will address each claim in turn.

### A. CAVRA Claim Under 18 U.S.C. § 2255 (Count I)

Congress enacted § 2255 as part of the CAVRA to address the "multi-million dollar" child exploitation industry and the "lack [of] effective remedies" available to "exploitation victims" "under Federal law."  Pub. L. No. 99-500, § 702, 100 Stat. 1783, 1783-74 (1986). Section 2255 empowers victims of certain felonies related to sex trafficking, sexual abuse, and the distribution of child pornography to recover damages for the harms caused by their abusers. The statute reads:

> Any person who, while a minor, was a victim of a violation of section 1589, 1590, 1591, 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, or 2423 of this title and who suffers personal injury as a result of such violation . . . may sue in any appropriate United States District Court and shall recover the actual damages such person sustains or liquidated damages in the amount of $150,000, and the cost of the action, including reasonable attorney's fees and other litigation costs reasonably incurred.  The court may also award punitive damages and such other preliminary and equitable relief as the court determines to be appropriate.

18 U.S.C. § 2255(a).  No criminal conviction is necessary to recover damages.  Prewett v. Weems, 749 F.3d 454, 458 (6th Cir. 2014) (reaching this conclusion after considering the plain meaning of the term "violation," distinct uses of "violation" and "conviction" in neighboring statutes, and civil RICO's violation requirement).  Rather, a plaintiff need only show that the defendant committed one of the enumerated offenses by a preponderance of the evidence.  Id.;

Smith v. Husband, 376 F. Supp. 2d 603, 613 (E.D. Va. 2005); Doe v. Liberatore, 478 F. Supp. 2d 742, 755 (M.D. Pa. 2007).

> The amended complaint alleges that Plaintiffs
>
> were minors at the time they were sexually abused and assaulted, sexually exploited, transported across state lines for illegal sexual activity, and used in creating illegal and obscene digital materials in contravention of *18 U.S.C §§ 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, and 2223*, thus constituting violations of 18 U.S.C. §2255.

(Am. Compl. ¶ 346, ECF No. 8) (emphasis added). Plaintiffs claim that these acts were "enabled by the ongoing certification and ratification" of Varsity, USASF, USA Cheer, Bain, and Charlesbank since Rockstar Cheer was "held out" by those Defendants "as being part of a network of safe and trustworthy cheer coaching gyms." (Id. ¶¶ 341, 345, ECF No. 8.) As explained below, however, Plaintiffs have not stated a plausible claim for relief against Varsity under § 2255.

To begin, notably absent from Plaintiffs' responses to the Varsity Defendants' motions to dismiss is any discussion of the eleven predicate offenses cited in the amended complaint. Plaintiffs instead spend several pages discussing only 18 U.S.C. §§ 1589 (forced labor) and 1591 (sex trafficking) – statutes that they did not include in their amended complaint. The court cannot consider claims raised for the first time in a response to a motion to dismiss. 2 James Wm. Moore, Moore's Federal Practice § 12.34[2] (3d ed. 2022); Mylan Labs., Inc. v. Akzo, N.V., 770 F.Supp. 1053, 1068 (D. Md. 1991) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (quoting Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984))); Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir.1988) ("[L]egal theories set forth in [a] brief are helpful only to the extent that they find support in the allegations set forth in the complaint."). To hold

otherwise would effectively allow a party to circumvent the amendment requirements of Rule 15(a).[6]  See Morgan Distrib. Co. v. Unidynamic Corp., 868 F.2d 992, 995 (8th Cir. 1989).

In any event, Plaintiffs' § 2255 claim fails because they have not pled specific facts suggesting that the Varsity Defendants themselves committed any of the predicate offenses actually alleged in the amended complaint.[7]  (Am. Compl. ¶¶ 200-338, ECF No. 8) (detailing allegations of abuse committed by Defendants Scott Foster, Black, Holley, Guyton, Plank, Hinton, and other, unidentified coaches); Upton v. Vicknair, No. 21-407, 2021 WL 2635460, at *5 (E.D. La. June 25, 2021) (unpublished) ("[A] claim under § 2255 is limited to a defendant [who] committed the acts described in any of the listed offenses.  Because Plaintiff does not allege that the City Defendants violated any of the enumerated statutes, this claim will be dismissed." (internal quotation marks and citation omitted)).

Finally, to the extent Plaintiffs seek to hold Varsity secondarily liable under an aiding-and-abetting theory, a plain reading of § 2255 and Supreme Court case law foreclose that argument.[8]

---

[6] Even if the court were to consider the new grounds for relief that Plaintiffs raise in their response brief, Plaintiffs have not sufficiently alleged how Varsity violated § 1589(b) or § 1591(a)(2).

[7] Plaintiffs are not pursuing a theory of vicarious liability against Varsity.  See (Am. Compl. ¶ 185, ECF No. 8) ("The unlawful acts alleged against Defendants Webb, Varsity, USASF, and USA Cheer, and vicariously against Defendant Charlesbank and Defendant Bain Capital in this Complaint . . . .")

[8] The federal aiding-and-abetting statute provides that "[w]hoever . . . aids, abets, counsels, commands, induces or procures [the commission of an offense against the United States] is punishable as a principal."  18 U.S.C. § 2(a).  The Varsity Defendants and the authorities on which they rely seem to conflate vicarious liability with aiding-and-abetting liability.  Vicarious liability allows a defendant to be held liable for the bad acts of another simply because of the defendant's relationship with the wrongdoer.  Restatement (Second) of Agency § 219 (Am. L. Inst. 1958).  On the other hand, aiding-and-abetting liability holds a

16

When interpreting a statute, the court begins, as always, with the statute's text.  United

States v. Bryant, 949 F.3d 168, 174 (4th Cir. 2020).  The court "must presume that [Congress]

says in a statute what it means and means in a statute what it says."  Conn. Nat'l Bank v.

Germain, 503 U.S. 249, 253-54 (1992).  "When the words of a statute are unambiguous, then,

this first canon is also the last: judicial inquiry is complete."  Id. at 254 (internal quotation marks

omitted).  Section 2255 makes no mention of secondary liability, which "by itself is an

indication that Congress did not intend to permit such a theory."  Doe v. City of Gauley Bridge,

No. 2:21-cv-00491, 2022 WL 3587827, at *13 (S.D. W. Va. Aug. 22, 2022) (unpublished);

Boim v. Holy Land Found. for Relief & Dev., 549 F.3d 685, 689 (7th Cir. 2008) (en banc)

(Posner, J.) ("[S]tatutory silence on the subject of secondary liability means there is none.").

        To be sure, the court recognizes that a few other courts have read secondary liability into

§ 2255.  See Liberatore, 478 F. Supp. 2d at 756-57; Doe v. Schneider, No. 08-3805, 2013 WL

5429229, at *10 (E.D. Pa. Sept. 30, 2013) (unpublished) (following Liberatore); M.A. ex rel.

P.K. v. Village Voice Media Holdings, LLC, 809 F. Supp. 2d 1041, 1053-54 (E.D. Mo. 2011)

(same).  In doing so, however, those courts overlooked the Supreme Court's decision in Central

Bank, N.A. v. First Interstate Bank, N.A., 511 U.S. 164 (1994).  Central Bank concerned

whether a private cause of action extends to suits against aiders and abettors of securities fraud

under § 10(b) of the Securities and Exchange Act of 1934.  511 U.S. at 167.  The Court

answered that question in the negative, reasoning that "Congress kn[ows] how to impose aiding

---

defendant responsible for his own acts in helping the wrongdoer.  Rosemond v. United States,
572 U.S. 65, 71 (2014) ("[A] person is liable under § 2 for aiding and abetting a crime if (and
only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of
facilitating the offense's commission.").

and abetting liability when it cho[oses] to do so. If . . . Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text. But it did not." Id. at 176-77 (internal citations omitted). The Court went on to explain that because "Congress has not enacted a general civil aiding and abetting statute," "there is no general presumption that [a] plaintiff may also sue aiders and abettors" when Congress creates a private cause of action. Id. at 182.

Central Bank's rationale is not limited to the context of federal securities laws, as "nothing in its holding turns on particular features of those laws." Boim, 549 F.3d at 689; see also Owens v. BNP Paribas, S.A., 897 F.3d 266, 277-78 (D.C. Cir. 2018) (relying on Central Bank in holding that the pre-Justice Against Sponsors of Terrorism Act version of 18 U.S.C. § 2333 does not permit aiding-and-abetting liability); Freeman v. DirecTV, Inc., 457 F.3d 1001, 1006 & n.1 (9th Cir. 2006) (relying on Central Bank in holding that §§ 2702 and 2707 of the Electronic Communications Privacy Act do not allow for secondary liability). As a result, the court finds the reasoning of Central Bank controlling and declines to read secondary liability into § 2255.

Based on the above, Plaintiffs have failed to state a § 2255 claim against Varsity. The court therefore grants the Varsity Defendants' motions to dismiss Count I.

### B. RICO Claims Under 18 U.S.C. § 1962(c), (d) (Count II)

18 U.S.C. § 1964 provides a civil cause of action for "[a]ny person injured in his business or property by reason of a violation" of RICO's substantive provisions found in § 1962. Section 1962(c), in turn, prohibits "any person employed by or associated with any enterprise" that engages in interstate commerce from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." To state a

claim under § 1962(c), then, a plaintiff must allege that the defendant (1) conducted (2) an enterprise (3) through a pattern (4) of racketeering activity, Sedima, S.P.R.L. v. Imrex, Co., 473 U.S. 479, 496 (1985), and that the plaintiff suffered  injury to "business or property" as a result, Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc., 262 F.3d 260, 264 (4th Cir. 2001). RICO's conspiracy provision, § 1962(d), makes it "unlawful for any person to conspire to violate any of the provisions" of § 1962, including § 1962(c).

Varsity challenges nearly every aspect of Plaintiffs' RICO claims under §§ 1962(c) and (d).  As explained below, the court finds that Plaintiffs have not plausibly alleged (1) RICO standing, (2) an association-in-fact enterprise, or (3) that Varsity conspired to commit a RICO violation.

### 1. RICO Standing

RICO's standing requirement has two elements: injury to "business or property" and causation.  Brandenburg v. Seidel, 859 F.2d 1179, 1187 (4th Cir. 1988).

To begin, Varsity correctly notes – and Plaintiffs do not appear to challenge – that any personal injuries Plaintiffs may have suffered as a result of the alleged abuse cannot confer RICO standing.  Bast v. Cohen, Dunn & Sinclair, P.C., 59 F.3d 492, 496 (4th Cir. 1995) ("[A]llegation[s] of personal injury and pecuniary losses occurring therefrom are not sufficient to meet the statutory requirement of injury to 'business or property.'").  Plaintiffs, for their part, argue that their lost ability to cheer competitively and the dues and fees they paid Varsity and USASF are sufficient to satisfy RICO's standing requirement.  The court will discuss the sufficiency of these alleged harms in turn.

19

### a. Lost Ability to Cheer Competitively

Plaintiffs contend that they had an identifiable property interest in the "continued ability to cheer competitively," which would have allowed them to achieve and monetize social media fame, earn athletic scholarships, and perhaps one day become cheer coaches, gym owners, or event promoters themselves.  (RICO Case Statement 45, ECF No. 38.)  This argument lacks merit for two reasons.  First, any injuries that Plaintiffs might suffer from having their competitive cheerleading careers cut short are too speculative to constitute injury to business or property within the meaning of § 1964(c).  See Price v. Pinnacle Brands, 138 F.3d 602, 607 (5th Cir. 1998) ("Injury to mere expectancy interests or to an intangible property interest is not sufficient to confer RICO standing." (internal quotation marks omitted)).  Plaintiffs had, at best, mere expectancy interests in "realizing future financial and business opportunities in which [they] and their famil[ies] invested."  (RICO Case Statement 46, ECF No. 38); see, e.g., Bowen v. Adidas Am., Inc., 541 F. Supp. 3d 670, 679-80 (D.S.C. 2021) (holding that a former college basketball player had an "unrecoverable expectancy interest . . . . in the supposed lost professional earnings he hoped to obtain as a first-round NBA draft pick"); Strates Shows, Inc. v. Amusements of Am., Inc., 379 F. Supp. 2d 817, 827-28 (E.D.N.C. 2005) (finding that plaintiff lacked a property interest in the expectation of a contract even though plaintiff had been awarded the contract "as a matter of course in past years"); In re Taxable Mun. Bond Sec. Litig., 51 F.3d 518, 523 (5th Cir. 1995) ("Anderson's suit shows only a lost opportunity to obtain a . . . loan.  Such lost opportunity by itself does not constitute an injury that confers standing to bring a RICO cause of action.").

Second, even if Plaintiffs had incurred concrete losses from being unable to continue cheerleading, those losses could not confer RICO standing as they would be derivative of non-

compensable personal injuries – that is, those stemming from the alleged sexual abuse Plaintiffs

suffered.  RICO's "injury to business or property" requirement excludes from its reach not only

personal injuries, but also "pecuniary losses occurring therefrom."  Bast, 59 F.3d at 495; Doe v.

Roe, 958 F.2d 763, 768-70 (7th Cir. 1992) (miscellaneous expenses flowing from mental

distress caused by arrangement in which plaintiff was coerced into paying for legal fees with

sexual services not actionable under RICO); Grogan v. Platt, 835 F.2d 844, 848 (11th Cir. 1988)

(economic damages, including loss of income, resulting from murder not actionable).

For these reasons, Plaintiffs cannot state a RICO claim based on any damages resulting

from their lost ability to compete in competitive cheerleading.

### b. Membership Dues and Competition Fees

Next, Plaintiffs claim that they have RICO standing based on the "membership dues,

fees, and other incidental costs they paid to Defendants."  (RICO Case Statement 46, ECF No.

38.)

Although money undeniably is "a form of property," Reiter v. Sonotone Corp., 442 U.S.

330, 338 (1979), Varsity argues that the sums Plaintiffs paid to become members of USASF and

compete in Varsity competitions also derive from their personal injuries.  That argument is

unavailing, however, as Plaintiffs paid their dues and fees *before* they suffered abuse, not the

other way around.  Thus, the dues and fees Plaintiffs paid to USASF and Varsity cannot be said

to derive from their non-compensable personal injuries.

Suffering injury to one's business or property, though, is only half of the RICO standing

equation.  Plaintiffs must also show that Defendants' predicate acts were both the but-for and

proximate cause of their alleged injury.  Hemi Grp., LLC v. City of New York, 559 U.S. 1, 9

(2010).  Varsity contends that Plaintiffs cannot show causation, citing Gilbert v. U.S. Olympic

Comm., No. 18-cv-00981-CMA-MEH, 2019 WL 1058194 (D. Colo. Mar. 6, 2019)

(unpublished), Report and Recommendation adopted in relevant part by 423 F. Supp. 3d 1112

(D. Colo. 2019). The plaintiffs in Gilbert were female taekwondo athletes who allegedly

suffered sexual abuse while competing in the USA Taekwondo ("USAT") system. Id. at *1. In

support of their RICO claim, the plaintiffs argued that they had RICO standing based in part on

the $50 annual membership fee they each paid the USAT. Id. at *24. The court rejected that

argument, reasoning that "Plaintiffs paid $50 in dues to be members of USAT" and "participate

in USAT-sanctioned events," not because of the defendants' predicate acts. Id. at *25. A

similar conclusion is warranted in this case.

"When a court evaluates a RICO claim for proximate causation, the central question it

must ask is whether the alleged violation led *directly* to the plaintiff's injuries." Anza v. Ideal

Steel Supply Corp., 547 U.S. 451, 461 (2006) (emphasis added). In other words, the focus is not

"on whether the harm to the RICO plaintiff was a foreseeable result of the defendant's conduct

or even whether it was 'the intended consequence[] of [that] behavior,' but rather on 'the

directness of the relationship between the conduct and the harm.'" Slay's Restoration, LLC v.

Wright Nat'l Flood Ins. Co., 884 F.3d 489, 493 (4th Cir. 2018) (emphases removed) (quoting

Hemi Grp., 559 U.S. at 12).

In their RICO case statement, Plaintiffs state that "[t]he actions of the Enterprise and its

conspirators were the direct and proximate cause of [their] injuries." (RICO Case Statement 46,

ECF No. 38.) Those allegations, however, are precisely the sort of "[t]hreadbare recitals of the

elements of a cause of action, supported by mere conclusory statements," that the court need not

accept. Iqbal, 556 U.S. at 678. Although Plaintiffs claim that "[b]ut for the fraudulent

assurances to their parents that the gyms and coaches were certified safe, *the abuse* would not

have occurred," (RICO Case Statement 46, ECF No. 38) (emphasis added), nowhere do any of the nine Plaintiffs allege that they paid dues and fees as a direct result of any party's purported misrepresentations.[9]  Rather, Plaintiffs seemingly paid membership dues and competition fees out of necessity to participate in events sanctioned by USASF and Varsity.  See (Am. Compl. ¶ 51, ECF No. 8) ("Defendant Webb, through Defendant Varsity, founded Defendant USASF, and mandated that All-Star athletes purchase a USASF membership as a requirement to competing at Varsity-sponsored events."); (Id. ¶ 56, ECF No. 8) ("All-Star athletes competing on behalf of Varsity-associated gyms pay monthly or annual fees to the gym as well as annual fees to the Varsity Defendants for competition attendance, uniforms, accessories, and other related fees." ); (Id. ¶¶ 223, 243, 250, 266, 280, 298, 305, 316, 338, ECF No. 8); see also Gilbert, 2019 WL 1058194, at *25.

---

[9] To be sure, a plaintiff asserting a RICO claim based on wire or mail fraud "need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations."  Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 661 (2008).  The plaintiffs in Bridge were regular participants in a county's tax lien auctions who alleged that the defendants' false attestations of compliance with the county's rule prohibiting simultaneous bidding deprived them of their fair share of winning bids. Id. 642-44.  The Court held that the plaintiffs' RICO claims could proceed even though the defendants' misrepresentations were directed to and relied on by the county – and not the plaintiffs.  The Court clarified, however, that

> none of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations. . . . In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation.

Id. at 658 (emphasis in original).  In contrast to Bridge, this case does not present a third-party reliance scenario.  Thus, if Plaintiffs (or their parents) did not rely on Defendants' alleged misrepresentations in paying Plaintiffs' membership dues and competition fees, Plaintiffs could not have been injured by reason of Defendants' alleged fraudulent scheme.  After all, "a misrepresentation can cause harm only if a recipient of the misrepresentation relies on it."  Id. at 656 n.6.

23

Thus, having not adequately alleged that they were injured "by reason" of Defendants' predicate acts, Plaintiffs cannot state a RICO claim based on the "membership dues, fees, and other incidental costs they paid to Defendants." (RICO Case Statement 46, ECF No. 38.)

## 2. Enterprise

Even if Plaintiffs could establish RICO standing, their § 1962(c) claim would still be subject to dismissal for failure to plausibly allege the existence of an association-in-fact enterprise.

A RICO enterprise "includes any . . . group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "Such a group need not have a hierarchical structure or a 'chain of command'" or business-like characteristics such as "a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." Boyle v. United States, 556 U.S. 938, 948 (2009). Rather, "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Id. at 946.

Plaintiffs allege that all named Defendants formed an association-in-fact enterprise to "endanger[] the Plaintiffs as minor athletes by exposing them to illegal sexual abuse and exploitation" all while charging them dues and fees "to compete in the self-same system of abuse." (RICO Case Statement 35-36, ECF No. 38). Plaintiffs, though, have pled no facts to suggest that the Rockstar Cheer coaches shared a common purpose with the Varsity Defendants, USASF, USA Cheer, Webb, Bain, and Charlesbank. Indeed, based on the facts alleged in Plaintiffs' amended complaint and RICO case statement, the individual coaches and corporate entities had divergent goals: the coaches sought to prey on minor athletes for their own sexual or

24

personal gratification; the corporate entities sought to retain athletes and attract new ones to generate more money.  Cf. Baker v. IBP, Inc., 357 F.3d 685, 691 (7th Cir. 2004) (Easterbrook, J.) (no common purpose where employer allegedly hired undocumented workers to depress wages because the employer "want[ed] to pay lower wages," "the recruiters want[ed] to be paid more for services rendered," and the immigrant-welfare organization "want[ed] to assist members of its ethnic group"); McPeters v. Edwards, 806 F. Supp. 2d 978, 988-89 (S.D. Tex. 2011) (no common purpose because the defendant judge's "purpose in ordering e-filing was to encourage efficiency, while LexisNexis's purpose was to generate profits"); Marshall v. Goguen, Cv 21-19-M-DWM, 2022 WL 1641776, *17 (D. Mont. May 24, 2022) (unpublished) (no common purpose because one defendant "sought to preserve his reputation, while [other defendants] sought to financially benefit off him"), appeal filed, 22-35499 (9th Cir. June 27, 2022).  It strains credulity to suggest, as Plaintiffs do, that Varsity, its corporate parents, and cheerleading's governing bodies intended to subject the very athletes they relied on as a major revenue source to "illegal sexual abuse and exploitation" as a means of generating further profits.  (RICO Case Statement 35-36, ECF No. 38.)  In short, without nonconclusory allegations that Varsity shared a common purpose with the perpetrators of the alleged abuse, Plaintiffs have failed to allege a RICO enterprise.

### 3. RICO Conspiracy

Plaintiffs' RICO conspiracy claim against Varsity under § 1962(d) is also deficient. Because Plaintiffs lack RICO standing and have not adequately alleged the existence of a RICO enterprise, they cannot assert a § 1962(c) claim against any Defendant.  Without a viable

§ 1962(c) claim, their conspiracy claim under § 1962(d) necessarily fails, too.  GE Inv. Priv. Placement Partners II v. Parker, 247 F.3d 543, 551 n.2 (4th Cir. 2001); Foster v. Wintergreen Real Est. Co., 363 F. App'x 269, 275 n.6 (4th Cir. 2010) (unpublished).

Even if Plaintiffs had sufficiently alleged a substantive RICO violation, their § 1962(d) claim would still be subject to dismissal for failure to state a claim.  "To satisfy § 1962(d), the plaintiff must establish two elements: (1) that two or more people agreed that some member of the conspiracy would commit at least two racketeering acts (i.e. a substantive RICO offense) and, (2) that the defendant knew of and agreed to the overall objective of the RICO offense."  Borg v. Warren, 545 F. Supp. 3d 291, 319 (E.D. Va. 2021).  In describing the alleged conspiracy, Plaintiffs state that Defendants "operated as a single unified entity with the common goal of taking billions of dollars from minor athletes who wanted to be a part of Defendants' All-Star cheer world" and that Defendants "act[ed] as a collective group" in "endangering the Plaintiffs."  (RICO Case Statement 44-45, ECF No. 38.)  Apart from these conclusory allegations, Plaintiffs have alleged no facts tending to show that each Defendant agreed that some member of the conspiracy would commit at least two racketeering acts.  See Chambers v. King Buick GMC, LLC, 43 F. Supp. 3d 575, 607 (D. Md. 2014) ("[B]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." (quoting Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 25 (2d Cir. 1990))); Walters v. McMahen, 795 F. Supp. 2d 350, 355 (D. Md. 2011) (stating that a plaintiff bringing a § 1962(d) claim must "describe in detail the conspiracy, including the identity of the co-conspirators, the object of the conspiracy, and the date and substance of the conspiratorial agreement").

26

For these reasons, Plaintiffs have failed to state a valid § 1962(d) claim against Varsity. The court therefore grants the Varsity Defendants' motions to dismiss Count II in its entirety.

### C. SCUTPA Claim Under S.C. Code Ann. § 39-5-20(a) (Count III)

SCUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § 39-5-20(a). To state a SCUTPA claim, Plaintiffs must allege that (1) Varsity "engaged in an unfair or deceptive act in the conduct of trade or commerce"; (2) "the unfair or deceptive act affected public interest"; and (3) Plaintiffs "suffered monetary or property loss as a result of [Varsity's] unfair or deceptive act(s)." Maybank v. BB&T Corp., 787 S.E.2d 498, 512 (S.C. 2016).

Varsity argues that Plaintiffs' SCUTPA claim should be dismissed "because there are no specific allegations in the entire 75-page complaint that any action by Varsity . . . was unfair or deceptive in the conduct of trade or commerce." (Varsity Spirit Mem. Supp. Mot. Dismiss 17, ECF No. 101-1) (Varsity Brands & Varsity Holding Mem. Supp. Mot. Dismiss 9-10, ECF No. 98-1.) Plaintiffs respond that they have satisfied the deceptive act requirement based on their allegations that Varsity misrepresented the safety of its competitions and affiliate gyms. (Resp. Opp'n Varsity Brands & Varsity Holding Mot. Dismiss 21, ECF No. 120) (arguing that "Defendants were involved in a continuous scheme to misrepresent the level of athlete protection the Varsity network provided" and "went to great lengths to publicly represent the safe environment an athlete could expect"); (Resp. Opp'n Varsity Spirit Mot. Dismiss 22-23, ECF No. 119) (same).

Although SCUTPA does not define what qualifies as a "deceptive" act, it provides that courts "will be guided by" Federal Trade Commission ("FTC") and federal court interpretations of § 5(a)(1) of the Federal Trade Commission Act. S.C. Code Ann. § 39-5-20(b). A practice is

deceptive for § 5(a)(1) purposes if it is material and "likely to mislead" a reasonable consumer. In re Cliffdale Assocs., Inc., 103 F.T.C. 110, 1984 WL 565319, at *37 (1984). Under this "likely to mislead" standard, the FTC is not required to show proof of actual consumer deception. Id.; see also Trans World Accounts, Inc. v. F.T.C., 594 F.2d 212, 214 (9th Cir. 1979); Thiret v. F.T.C., 512 F.2d 176, 180 (10th Cir. 1975). The same is true when the South Carolina Attorney General brings a SCUTPA enforcement action. State ex rel. Wilson v. Ortho-McNeil-Janssen Pharm., Inc., 777 S.E.2d 176, 189, 192 (S.C. 2015) ("[I]n an enforcement action brought by the Attorney General, there is no actual impact requirement.").

In contrast, a private litigant bringing a SCUTPA claim must show actual injury and a "causal connection" between that injury and the complained-of deceptive act. Id. (explaining that S.C. Code Ann. § 39-5-140(a) imposes "a requirement beyond the tendency to deceive element"). Establishing this causal connection in a misrepresentation case necessarily requires proof that the plaintiff detrimentally relied on the defendant's deceptive conduct. See, e.g., Hageman v. Twin City Chrysler-Plymouth, Inc., 681 F. Supp. 303, 308-09 (M.D.N.C. 1988) (applying North Carolina law and stating that "[t]o prove actual causation, a plaintiff must prove that he or she detrimentally relied on the defendant's deceptive statement or misrepresentation. . . . [A] private plaintiff cannot recover in an action for a deceptive trade practice if the plaintiff is unable to prove that the deceptive practice worked."). It is at this step that Plaintiffs' SCUTPA claim fails.

Setting aside whether Varsity's conduct was deceptive within the meaning of SCUTPA, the amended complaint contains no allegations that Plaintiffs actually relied on Varsity's safety representations in deciding to cheer for Varsity-affiliated gyms and compete at Varsity competitions. The amended complaint does not state which of the Plaintiffs encountered

Varsity's representations (or when they did), nor does it even allege that Plaintiffs would have acted differently had they known the truth of the misrepresentations. Because Plaintiffs have not adequately alleged a causal nexus between their payment of fees and expenses to Varsity, on the one hand, and Varsity's purported deceptive conduct, on the other, Plaintiffs cannot maintain their SCUTPA claim. Thus, the court grants the Varsity Defendants' motions to dismiss Count III.

### D. Gross Negligence and Negligent Security (Counts IV and XI)

A negligence claim consists of three elements: "(1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach." Carolina Chloride, Inc. v. Richland Cnty., 714 S.E.2d 869, 873 (S.C. 2011) (quoting Tanner v. Florence Cnty. Treasurer, 521 S.E.2d 153, 158 (S.C. 1999)). "If any of these elements is absent a negligence claim is not stated." Summers v. Harrison Constr., 381 S.E.2d 493, 495 (S.C. Ct. App. 1989).

"Gross negligence is the intentional conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do." Etheredge v. Richland Sch. Dist. One, 534 S.E.2d 275, 277 (S.C. 2000). In other words, "[i]t is the failure to exercise slight care." Id. "In most cases, gross negligence is a factually controlled concept whose determination best rests with the jury." Faile v. S.C. Dep't of Juv. Just., 566 S.E.2d 536, 545 (S.C. 2002). But "when the evidence supports but one reasonable inference, the question becomes a matter of law for the court." Etheredge, 534 S.E.2d at 277.

Varsity argues that Plaintiffs' gross-negligence and negligent-security claims must be dismissed because it did not owe Plaintiffs a duty.

29

"An affirmative legal duty exists only if created by statute, contract, relationship, status, property interest, or some other special circumstance." Hendricks v. Clemson Univ., 578 S.E.2d 711, 714 (S.C. 2003). South Carolina law recognizes that "there is no general duty to control the conduct of another or to warn a third person or potential victim of danger." Madison v. Babcock Ctr., Inc., 638 S.E.2d 650, 656 (S.C. 2006). There are, however, five exceptions to this general rule:

> (1) where the defendant has a special relationship to the victim; (2) where the defendant has a special relationship to the injurer; (3) where the defendant voluntarily undertakes a duty; (4) where the defendant negligently or intentionally creates the risk; and (5) where a statute imposes a duty on the defendant.

Id. Plaintiffs argue that the second, third, and fourth exceptions apply. (Resp. Opp'n Varsity Brands & Varsity Holding Mot. Dismiss 22-25, ECF No. 120); (Resp. Opp'n Varsity Spirit Mot. Dismiss 24-26, ECF No. 119.)

The second exception arises "when the defendant 'has the ability to monitor, supervise and control an individual's conduct' *and* when "'the individual has made a specific threat of harm directed at a specific individual.'" Doe v. Marion, 645 S.E.2d 245, 250 (S.C. 2007) (emphasis added) (quoting Bishop v. S.C. Dep't of Mental Health, 502 S.E.2d 78, 81 (S.C. 1998)). Plaintiffs cannot rely on this exception to establish a duty because, regardless of whether Varsity had the ability to control the individual coaches' conduct, nothing in the amended complaint suggests that Varsity was aware of a specific threat of harm aimed at a specific Plaintiff. See id. ("[I]t is not simply foreseeability of the victim which gives rise to a person's liability for failure to warn; rather, it is the person's awareness of a distinct, specific, overt threat of harm which the individual makes towards a particular victim." (quoting Gilmer v. Martin, 473 S.E.2d 812, 814 (S.C. Ct. App. 1996))).

Turning next to the third exception, South Carolina follows the negligent-undertaking rule set forth in § 323 of the Restatement (Second) of Torts.  Wright v. PRG Real Est. Mgmt., 826 S.E.2d 285, 290-91 (S.C. 2019).  Section 323 states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>     (a) his failure to exercise such care increases the risk of such harm, or
>     (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (Am. Law. Inst. 1965).

As for the fourth exception, a duty may arise when "a defendant creates 'a situation that [it] knew or should have known posed a substantial risk of injury' to a plaintiff."  In re Blackbaud, Inc., Customer Data Breach Litig., 567 F. Supp. 3d 667, 682 (D.S.C. 2021) (quoting Edwards v. Lexington Cnty. Sheriff's Dep't, 688 S.E.2d 125, 130 (S.C. 2010)).  As explained below, the court finds that Plaintiffs have alleged facts sufficient to show that Varsity owed them a duty of care under the third and fourth exceptions.

The amended complaint details how Varsity created USASF to serve as All Star cheer's rulemaking body and the entity responsible for certifying coaches and gyms and maintaining the sport's safety guidelines.  (Am. Compl. ¶¶ 48, 51, 86-87, 92, 164, ECF No. 8).  It further alleges that Varsity has exercised pervasive control over USASF since USASF's inception in 2003.  (Id. ¶¶ 96-100, ECF No. 8.)  Plaintiffs – who were required to become USASF members to compete at Varsity events – state that Varsity and other Defendants knew of the "dangers" posed by the competitive cheerleading environment and thus "created rules specifically intended to address the risks of sexual, physical, and mental exploitation of minor athletes by coaches[] and adults." (Id. ¶¶ 51, 387-88, ECF No. 8).  Yet, despite that knowledge and those guidelines, Defendants

(including Varsity) allegedly failed to vet coaches, investigate and report complaints of sexual abuse, and enforce rules related to "chaperoning and supervis[ing] minors" and banning coaches.  (Id. ¶¶ 126, 155, 157-60, 167, 169, 199, 389, 393, ECF No. 8.)  For example, Plaintiffs allege that Scott Foster was allowed to maintain contact with athletes while serving a USASF-imposed suspension for drinking alcohol with minors.  (Id. ¶¶ 117, 118, 149, ECF No. 8.)  Other coaches accused of abuse, such as Holley and Feeley, were purportedly allowed to "quietly. . . relocate to a new gym or facility without parents knowing about the allegations of misconduct." (Id. ¶¶ 126-28, ECF No. 8.)  In some cases, Plaintiffs allege, Varsity "ignored" complaints altogether.  (Am. Compl. ¶ 126, ECF No. 8); see also (id. ¶ 335, ECF No. 8) (alleging that "Jane Doe 7's mother's complaints [to USASF and Varsity] were dismissed as an attempt to manipulate her daughter's position on the cheer team and in the gym").

Based on these allegations, the court finds that Plaintiffs have sufficiently alleged that Varsity owed them a duty based on the third and fourth exceptions to the general "no duty to protect" rule.  See In re Blackbaud, 567 F. Supp. 3d at 682 (finding a duty where plaintiff consumers had alleged that defendant cloud software company knew of the risk of cyberattacks and the inadequacy of its systems yet "failed to correct, update, or upgrade its security protections").  The court further finds that Plaintiffs have sufficiently pled the breach, damages, and causation elements of their gross-negligence and negligent-security claims.  Thus, the Varsity Defendants' motions to dismiss Counts IV and XI for failure to state a claim are denied.

### E. Negligent Supervision (Count V)

In Count V, Plaintiffs assert a claim for negligent supervision against Varsity.  Under South Carolina law,

an employer may be liable for negligent supervision if the employee intentionally harms another when the employee: (1) is upon the premises of the employer, or is using a chattel of the employer, (2) the employer knows or has reason to know that he has the ability to control his employee, and (3) the employer knows or should know of the necessity and opportunity for exercising such control.

Charleston v. Young Clement Rivers & Tisdale, LLP, 598 S.E.2d 717, 722-23 (S.C. Ct. App. 2004) (citing Degenhart v. Knights of Columbus, 420 S.E.2d 495, 496 (S.C. 1992)); see also Restatement (Second) of Torts § 317.

In opposing the Varsity Defendants' motions to dismiss, Plaintiffs explain that their negligent-supervision claim is based on "a limited principal-agent relationship" between Varsity and USASF, USA Cheer, and Rockstar. (Resp. Opp'n Varsity Brands & Varsity Holding Mot. Dismiss 26, ECF No. 120); (Resp. Opp'n Varsity Spirit Mot. Dismiss 27, ECF No. 119.) In essence, Plaintiffs seek to hold one entity liable for the negligent supervision of multiple other entities. That argument, however, does not find support in South Carolina law or § 317 of the Restatement.

A claim for negligent supervision is necessarily predicated on the existence of an employment relationship. Degenhart, 420 S.E.2d at 496 ("An *employer* may be liable for negligent supervision if the *employee* . . . ." (emphasis added)). Such a claim arises only when "the employee intentionally harms another" on the employer's premises or while using the employer's chattel. Id.; see Doe by Doe v. Greenville Hosp. Sys., 448 S.E.2d 564, 568 (S.C. Ct. 1994) (affirming denial of directed verdict where the employee sexually assaulted a minor on the employer's premises and the employer knew of a prior incident of inappropriate sexual behavior by the employee). The court is unaware, though, of any South Carolina authority that would allow Plaintiffs to maintain their negligent-supervision claim in the absence of an employee-employer relationship. See Callum v. CVS Health Corp., 137 F. Supp. 3d 817, 861 (D.S.C.

2015) (dismissing negligent-supervision claim against certain defendants because the plaintiff had not plausibly alleged that the defendants "qualif[ied] as employers"); Bank of N.Y. v. Sumter Cnty, 691 S.E.2d 473, 477-78 (S.C. 2010) (affirming summary judgment in favor of the South Carolina Judicial Department because there was no evidence that a county's master-in-equity was employed by the Department).

The court therefore dismisses Plaintiffs' claim for negligent supervision against Varsity.

### F. Breach of Contract (Count VIII)

To state a claim for breach of contract, Plaintiffs must allege "the existence of a contract, its breach, and damages caused by such breach." Hotel & Motel Holdings, LLC v. BJC Enters., LLC, 780 S.E.2d 263, 272 (S.C. Ct. App. 2015).

Varsity argues that Plaintiffs' breach-of-contract claim fails because Plaintiffs have not alleged the existence of a binding contract between them and Varsity. (Varsity Spirit Mem. Supp. Mot. Dismiss 26-27, ECF No. 101-1); (Varsity Brands & Varsity Holding Mem. Supp. Mot. Dismiss 17-18, ECF No. 98-1.) Plaintiffs do not address this argument but instead argue that they are entitled to recover from Varsity for breach of the membership agreements that existed between Plaintiffs and USASF under a third-party beneficiary theory. (Resp. Opp'n Varsity Brands & Varsity Holding Mot. Dismiss 26-27, ECF No. 120); (Resp. Opp'n Varsity Spirit Mot. Dismiss 27-28, ECF No. 119.)

The third-party beneficiary doctrine addresses the circumstances in which a nonparty to a contract may sue to recover for the contract's breach. Beverly v. Grand Strand Reg'l Med. Ctr., 869 S.E.2d 812, 816 (S.C. 2022) ("Typically, the third-party beneficiary question arises from a situation in which a person who is not a party to the contract attempts to bring a civil action against a party to the contract for damages allegedly caused to the non-party by the party's

breach."); Bob Hammond Constr. Co. v. Banks Constr. Co., 440 S.E.2d 890, 891 (S.C. Ct. App. 1994) ("[I]f a contract is made for the benefit of a third person, that person may enforce the contract if the contracting parties intended to create a direct, rather than an incidental or consequential, benefit to such third person."). It is not, as Plaintiffs suggest, a vehicle for imposing liability on such non-contracting parties.

As a result, Plaintiffs cannot maintain a breach-of-contract claim against the Varsity Defendants, and the court grants their motions to dismiss Count VIII of the amended complaint.

### G. Unjust Enrichment (Count IX)

"A party may be unjustly enriched when it has and retains benefits or money which in justice and equity belong to another." Dema v. Tenet Physician Services-Hilton Head, Inc., 678 S.E.2d 430, 434 (S.C. 2009). To recover for unjust enrichment, a plaintiff must show "(1) that he conferred a non-gratuitous benefit on the defendant; (2) that the defendant realized some value from the benefit; and (3) that it would be inequitable for the defendant to retain the benefit without paying the plaintiff for its value." Sauner v. Pub. Serv. Auth., 581 S.E.2d 161, 167 (S.C. 2003).

The Varsity Defendants argue that Plaintiffs have not met their burden of pleading a plausible unjust-enrichment claim. (Varsity Spirit Mem. Supp. Mot. Dismiss 27-28, ECF No. 101-1); (Varsity Brands & Varsity Holding Mem. Supp. Mot. Dismiss 17, ECF No. 98-1.) The court disagrees. The amended complaint sufficiently alleges that Plaintiffs conferred benefits on Varsity through their payment of gym fees, competition fees, and various other expenses and that Varsity retained those benefits under inequitable circumstances.

Thus, because Plaintiffs have adequately alleged the elements of their unjust-enrichment claim, the Varsity Defendants' motions to dismiss Count IX are denied.[10]

### H. Fraud (Count X)

"Fraud is an intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to [a person] or to surrender a legal right." Regions Bank v. Schmauch, 582 S.E.2d 432, 444 (S.C. Ct. App. 2003). To plead fraud under South Carolina law, a plaintiff must plausibly allege

> (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury.

Id. at 444-45. "The failure to prove any element of fraud or misrepresentation is fatal to the claim." Schnellmann v. Roettger, 645 S.E.2d 239, 241 (S.C. 2007).

Along with pleading these elements, a party alleging fraud in federal court must also "state with particularity the circumstances constituting [the] fraud" under Federal Rule of Civil Procedure 9(b). Those circumstances include "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he

---

[10] The Varsity Defendants also briefly argue that Plaintiffs cannot pursue a claim for unjust enrichment while simultaneously asserting a claim for breach of contract. (Varsity Spirit Mem. Supp. Mot. Dismiss 27, ECF No. 101-1); (Varsity Brands & Varsity Holding Mem. Supp. Mot. Dismiss 18-19, ECF No. 98-1); see Turner v. Rams Head Co., No. 3:05-2893-CMC, 2007 WL 2579386, at *7 (D.S.C. Sept. 4, 2007) (unpublished) ("[A]n action for unjust enrichment cannot lie in the face of an express contract." (quoting 66 Am.Jur.2d Restitution and Implied Contracts § 24 (Thomson/West 2007)); Palmetto Health Credit Union v. Open Sols. Inc., 2010 WL 2710551, No. 3:08-cv-3848-CMC, at *4 (D.S.C. July 7, 2010) (unpublished). Contrary to Varsity's contention, however, the Federal Rules plainly allow parties to assert inconsistent theories of recovery at the pleading stage. Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims . . . as it has, regardless of consistency.")

obtained thereby," <u>Edmonson v. Eagle Nat'l Bank</u>, 922 F.3d 535, 553 (4th Cir. 2019) (internal

quotation marks omitted) – or more simply, "the who, what, when, where, and how of the

alleged fraud," <u>United States ex rel. Taylor v. Boyko</u>, 39 F.4th 177, 190 (4th Cir. 2022) (internal

quotation marks omitted).  "A lack of compliance with Rule 9(b)'s pleading requirements is

treated as failure to state a claim under Rule 12(b)(6)."  <u>Id.</u> (internal quotation marks omitted).

Plaintiffs' fraud theory is that Defendants knowingly misrepresented the safety of their

competitions and affiliate gyms to entice Plaintiffs and their families to pay annual dues and

fees.  (Am. Compl. ¶¶ 435-36, 440-41, ECF No. 8.)  Plaintiffs argue their fraud claim should

survive dismissal because they have identified "numerous misrepresentations by Defendants

about how they collectively made the sport safer for athletes," including "misrepresentations

related to the safe[ty of] competition and gym environment[s], credentialing and certification

of gyms and coaches, and centralized reporting."  (Resp. Opp'n Varsity Brands & Varsity

Holding Mot. Dismiss 28-29, ECF No. 120); (Resp. Opp'n Varsity Spirit Mot. Dismiss 30,

ECF No. 119.)  The court disagrees.

To begin, the amended complaint improperly relies on group pleading.  The eleven

paragraphs in Plaintiffs' fraud count contain only vague allegations, unattributed to any specific

Defendant.  (Am. Compl. ¶ 436, ECF No. 8) ("Defendants represented to Plaintiffs that . . . .");

(<u>Id.</u> ¶ 437, ECF No. 8) ("Defendants' promises . . . ."); (<u>Id.</u> ¶ 442, ECF No. 8) ("Defendants'

misrepresentations included . . . .").  Plaintiffs cannot satisfy Rule 9(b)'s heightened pleading

standard by "grouping defendants together" and failing to "specify[] which defendant committed

which wrong."  <u>Toney v. Lasalle Bank Nat'l Ass'n</u>, 896 F. Supp. 2d 455, 480 (D.S.C. 2012);

<u>Ascente Bus. Consulting, LLC v. DR myCommerce</u>, 9 F.4th 839, 845 (8th Cir. 2021) ("It is not

sufficient to attribute alleged false statements to 'defendants' generally.").

Even if the court were to consider Plaintiffs' RICO case statement in evaluating their fraud claim, Plaintiffs do not allege how any of the statements they attribute to Varsity – "[r]epresentations from the Varsity website related to participant safety"[11] – were demonstrably false at the time they were made.

Equally problematic, Plaintiffs' pleadings do not specify which, if any, of the Plaintiffs relied on those statements in deciding to join gyms affiliated with Varsity and compete at Varsity competitions. "How and whether a party relied on a misstatement is every bit as much

_____

[11] These statements include:

• "At Varsity Spirit and Varsity All Star, the health and safety of athletes is our top priority. Varsity Spirit is committed to creating a safe and positive environment for its participants' physical, emotional, and social development, and promoting an environment free from abuse and misconduct."

• "Varsity Brands, Varsity Spirit's parent company, has formed a Safety Council to include outside, independent experts who will help us closely examine and evolve current athlete safety guidance – including with respect to detecting and preventing sexual misconduct against minors – while incorporating best practices. Please direct all questions and concerns regarding safety to safety@varsity.com."

• "Varsity Spirit provides training to Varsity Spirit Instructors and Staff regarding abuse and reporting. Varsity Spirit enforces its own policies that prohibit abuse and misconduct and are designed to reduce, monitor and govern the areas where potential abuse and misconduct might occur, in addition to the policies implemented by USA Cheer and the USASF addressing certain types of abuse and misconduct. The following types of misconduct are specifically prohibited in these policies:
  a. Sexual Abuse and Misconduct;
  b. Physical Abuse and Misconduct;
  c. Emotional Abuse and Misconduct;
  d. Bullying, Threats, and Harassment;
  e. Hazing.
In addition, these policies contain proactive athlete protection measures such as restrictions on one-on-one interactions with minor athletes, travel policies, and communication policies."

(RICO Case Statement 33-34, ECF No. 38.)

'circumstance[] constituting fraud' as any other element." <u>Xia Bi v. McAuliffe</u>, 927 F.3d 177,

185 (4th Cir. 2019) (affirming dismissal of fraud claim for failure to comply with Rule 9(b)

where complaint "d[id] not state which of the named [p]laintiffs claims to have relied on each

statement, or where or how any specific [p]laintiff heard or learned of the alleged statements").

Further, although Plaintiffs generally allege that they "had a right to rely upon Defendants'

promises and did so rely," (Am. Compl. ¶ 438, ECF No. 8), that is merely a "formulaic

recitation" of the seventh and eighth elements required for a fraud claim, <u>Iqbal</u>, 556 U.S. at 681;

<u>see</u> <u>Belvin v. Sedgewood Manor Health Care Cntr., LLC</u>,  No. 3:21-cv-02169-JMC, 2022 WL

845817, at *4 (D.S.C. Mar. 22, 2022) (unpublished) (dismissing fraud claim where plaintiff

merely alleged that "Plaintiff and his family had a right to rely on the misrepresentations and

concealments made by the defendant").  Similarly, Plaintiffs make the generalized claim that

Varsity's alleged misrepresentations about "the safety and security of their competitions and

camps . . . lull[ed] *parents* into comfort," (Am. Compl. ¶ 68, ECF No. 8) (emphasis added), yet

fail to identify any particular parent.

 In sum, Plaintiffs' failure to satisfy Rule 9(b)'s particularity requirement is fatal to their

fraud claim, and Count X is dismissed as to Varsity.

### I. Civil Conspiracy (Count XII)

 To state a civil-conspiracy claim, a plaintiff must allege four elements: "(1) the

combination or agreement of two or more persons, (2) to commit an unlawful act or a lawful act

by unlawful means, (3) together with the commission of an overt act in furtherance of the

agreement, and (4) damages proximately resulting to the plaintiff."  <u>Paradis v. Charleston Cty.</u>

<u>Sch. Dist.</u>, 861 S.E.2d 774, 780 (S.C. 2021).  Because "civil conspiracy is an intentional tort, an

intent to harm . . . [is] an inherent part of th[is] analysis." <u>Id.</u> at 780 n.9.  A plaintiff asserting a

civil conspiracy claim must also allege acts "in furtherance of the conspiracy in a manner separate and independent from [their] other causes of action." Jinks v. Sea Pines Resort, LLC, No. 9:21-cv-00138-DCN, 2021 WL 4711408, at *3 (D.S.C. Oct. 8, 2021) (unpublished). Stated another way, if "the particular acts charged as a conspiracy are the same as those relied on as the tortious act or actionable wrong, plaintiff cannot recover damages for such act or wrong, and recover likewise on the conspiracy to do the act or wrong." Todd v. S.C. Farm Bureau Mut. Ins. Co., 278 S.E.2d 607, 611 (S.C. 1981), overruled on other grounds by Paradis, 861 S.E.2d at 780.

Here, Plaintiffs have merely summarized the allegations underlying their other causes of action and repackaged them into a claim for civil conspiracy. Plaintiffs' civil-conspiracy claim is the last count in their amended complaint. (Am. Compl. ¶¶ 452-66, ECF No. 8.) It incorporates all preceding allegations and generally alleges that Defendants misrepresented the safety of their gyms and competitions, failed to take appropriate action when faced with allegations of abuse, and reaped substantial financial benefits in the form of dues and fees. (Id. ¶¶ 452, 455-56, 461-62, 464-65, ECF No. 8.) But because Plaintiffs have not identified "additional acts in furtherance of the conspiracy separate and independent from other wrongful acts alleged in [their] complaint," Hackworth v. Greywood at Hammett, LLC, 682 S.E.2d 871, 875 (S.C. Ct. App. 2009), overruled on other grounds by Paradis, 861 S.E.2d at 780, they have failed to state a valid claim for civil conspiracy. As a result, the court grants the Varsity Defendants' motions to dismiss Count XII.

## V. Conclusion

For the reasons above, the court **GRANTS** the Varsity Defendants' motions to dismiss as to Count I (CAVRA), Count II (RICO), Count III (SCUTPA), Count V (negligent supervision), Count VIII (breach of contract), Count X (fraud), and Count XII (civil conspiracy),

but **DENIES** the Varsity Defendants' motions as to Count IV (gross negligence), Count IX

(unjust enrichment), and Count XI (negligent security).

It is therefore

**ORDERED** that Varsity Brands and Varsity Holding's motion to dismiss, docket

number 98, and Varsity Spirit's motion to dismiss, docket number 101, are granted in part and

denied in part.

**IT IS SO ORDERED.**

s/Henry M. Herlong, Jr.
Senior United States District Judge

Greenville, South Carolina
June 20, 2023