IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane )
Doe 4, Jane Doe 5, Jane Doe 6, Jane Doe 7, )   **C.A. No. 6:22-2957-HMH**
John Doe 1, John Doe 2, and John and Jane )
Does 1-100, )
             Plaintiffs, )   **OPINION & ORDER**
 )
    vs. )
 )
Varsity Brands, LLC; Varsity Spirit, LLC; )
Varsity Brands Holding Company, Inc.; )
U.S. All Star Federation; USA Federation )
of Sport Cheering d/b/a USA Cheer; Jeff )
Webb; Charlesbank Capital Partners, LP; )
Bain Capital, LP; Rockstar Cheer & Dance, )
Inc.; Katherine Anne Foster, *as the personal* )
*representative of the Estate of Scott Foster*; )
Kathy Foster, *individually*; Kenny Feeley; )
Josh Guyton; Nathan Allan Plank; )
Christopher Hinton; Tracy a/k/a or f/k/a )
Traevon Black; Peter Holley; and other )
Unknown Defendants, )
 )
             Defendants. )

      Before the court is Defendant U.S. All Star Federation's ("USASF") motion to dismiss

Plaintiffs' amended complaint under Federal Rule of Civil Procedure 12(b)(6). For the reasons

below, the court grants in part and denies in part USASF's motion.

## I. BACKGROUND

      Plaintiffs are nine former youth cheerleaders who allege that they were sexually abused

by coaches employed by Defendant Rockstar Cheer & Dance, Inc. ("Rockstar Cheer"), a

cheerleading gym affiliated with the Varsity Defendants.[1]  In addition to pursuing claims against the individual coaches and Rockstar Cheer, Plaintiffs seek to hold Varsity, Jeff Webb ("Webb"), Bain Capital, LP ("Bain"), Charlesbank Capital Partners, LP ("Charlesbank"), and competitive cheerleading's governing bodies – USA Federation of Sport Cheering ("USA Cheer") and USASF – liable for misrepresenting the safety of Varsity gyms and competitions and failing to adopt and enforce adequate athlete-safety policies and procedures.  The facts below are taken from Plaintiffs' amended complaint and are accepted as true for purposes of the present motion. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).[2]

### A. Overview of All Star Cheerleading

Unlike traditional sideline cheerleading, All Star cheerleading is a competition-based sport unto itself.  (Am. Compl. ¶¶ 42-43, ECF No. 8.)  All Star cheer teams compete by performing two-and-a-half minute routines set to music, which incorporate elements of tumbling, stunting, cheer, and dance.  (Id. ¶ 42, ECF No. 8.)  According to Plaintiffs, over four million athletes across the United States participate in All Star cheerleading at some level, with many training and competing year-round.  (Id. ¶¶ 44, 46, ECF No. 8.)  This level of commitment is expensive: a single season costs anywhere from $3,000 to $7,000 per athlete, while some

---

[1] The court refers to Defendants Varsity Brands, LLC ("Varsity Brands"), Varsity Brands Holding Company, Inc. ("Varsity Holding"), and Varsity Spirit, LLC ("Varsity Spirit") collectively as "Varsity" or the "Varsity Defendants."

[2] This case is one of four cases before the court involving similar allegations of sexual assault and essentially the same defendants.  6:22-cv-03508-HMH; 6:22-cv-03509-HMH; 6:22-cv-03510-HMH.  USASF has moved to dismiss the other three cases as well.  Those motions will be addressed in separate orders.

families spend more than $20,000 a year for transportation, lodging, membership fees, merchandise, and uniforms.  (Id. ¶ 45, ECF No. 8.)

The beginnings of the competitive cheerleading industry can be traced to Webb's founding of the predecessor to Varsity Spirit in 1974.  (Id. ¶ 80, ECF No. 8.)  Varsity Spirit began as a provider of educational training camps for cheerleaders and has since expanded into selling uniforms and apparel and organizing cheer competitions.  (Am. Compl. ¶ 81, ECF No. 8.)  It now controls an estimated 80-90% of the All Star cheer market.  (Id. ¶ 49, ECF No. 8.)  From 2014 to 2018, Varsity was wholly owned by Charlesbank, a Boston-based company.  (Id. ¶¶ 38, 107, ECF No. 8.)  Today, Varsity is owned by another Boston-based company – Bain – which purchased Varsity in 2018 for $2.5 billion.[3]  (Id. ¶¶ 39, 109, ECF No. 8.)

Two governing bodies oversee competitive cheerleading in the United States: USASF and USA Cheer.  (Id. ¶¶ 86, 89, ECF No. 8.)  Plaintiffs maintain that Varsity was heavily involved in creating and operating both organizations.  For example, Varsity allegedly advanced a $1.8 million interest-free loan to help launch USASF, submitted USASF's trademark application, and for at least fifteen years, housed USASF's offices at its corporate address and paid USASF's employees directly.  (Am. Compl. ¶¶ 85, 96-98, ECF No. 8.)  Varsity also continues to control a majority of the seats on USASF's board of directors, including all seats with voting rights.  (Id. ¶ 99, ECF No. 8.)  Similar to USASF, USA Cheer was purportedly created in 2007 with the help of an interest-free loan from Varsity, listed "Varsity's Tennessee

---

[3] At the same time, Plaintiffs allege that Charlesbank "made a new investment in Varsity alongside [Bain] and retained a minority stake in the business."  (Am. Compl. ¶ 109, ECF No. 8.)

headquarters as its own," and at one time had six Varsity employees on its board.  (Id. ¶¶ 89, 91, 103, ECF No. 8.)

As a result of Webb's and Varsity's ties to cheerleading's governing bodies, Plaintiffs contend, Webb and Varsity "were entirely self-regulated" and could control "all aspects of All-Star cheer."  (Id. ¶¶ 82, 95, ECF No. 8.)  As examples, Plaintiffs point out that:

- All Star athletes must buy a USASF membership to compete at Varsity events.  (Id. ¶ 51, ECF No. 8.)

- All Star athletes are required to pay annual or monthly dues to Varsity and their local Varsity-affiliated gym for "competition attendance, uniforms, accessories, and other related fees."  (Am. Compl. ¶ 56, ECF No. 8.)

- "Gyms and coaches likewise pay monthly or annual fees to USASF, USA Cheer and the Varsity Defendants."  (Id. ¶ 57, ECF No. 8.)

- Affiliate gyms are required "to sign multi-year supply contracts whereby the gyms are paid cash rebates from Varsity for buying [its] merchandise and for sending the gym's athletes to Varsity events."  (Id. ¶ 54, ECF No. 8.)

- "[M]embership in USASF[] and with a Varsity-affiliated gym mandates competing in a specified number of annual [V]arsity events."  (Id. ¶ 59, ECF No. 8.)

- Athletes and their families must purchase rooms at Varsity-selected hotels while at Varsity competitions; the failure to do so "subjects the athlete to disqualification."  (Id. ¶ 61, ECF No. 8.)

### B. Scott Foster and the Rockstar Cheer Gym

Defendant Scott Foster cheered collegiately at the University of Louisville, "a pre-eminent [sic] name in the world of competitive cheerleading," and began coaching youth cheerleaders in Kentucky in 1996.  (Am. Compl. ¶¶ 134-35, ECF No. 8.)  Shortly after moving to Greenville, South Carolina in 1999, Scott Foster opened an All Star cheer gym together with his wife, Defendant Kathy Foster.  (Id. ¶ 137, ECF No. 8.)  The couple at one point also operated World Spirit Federation, a competition cheerleading company, before selling the company to

Varsity Brands in 2006. (Id. ¶ 138, ECF No. 8.) A year later, in 2007, Scott and Kathy Foster opened Rockstar Cheer in Greenville. (Id. ¶ 139, ECF No. 8.) Rockstar Cheer's stated mission was "[t]o provide a structured environment of competitive cheerleading while accomplishing our goals [and] to teach dedication, commitment, self-confidence, teamwork, discipline, responsibility, and leadership in a family-friendly, safe and fun environment." (Id. ¶ 140, ECF No. 8.) To this end, USASF certified Rockstar Cheer "as meeting All-Star standards with respect to coach credentials, program quality, and athlete safety." (Am. Compl. ¶ 141, ECF No. 8.) According to Plaintiffs, this meant that USASF "warrant[ed] that [Rockstar Cheer], its coaches, and its choreographers were deemed safe, and that the gym followed best practices related to athlete safety." (Id. ¶ 53, ECF No. 1.)

In 2018, one of Rockstar Cheer's teams, Beatles, won Varsity's World Championship title. (Id. ¶ 144, ECF No. 8.) This accomplishment "further elevated Rockstar's status" and allowed Scott and Kathy Foster "to recruit athletes nationwide." (Id. ¶¶ 143-44, ECF No. 8.)

### C. Plaintiffs' Allegations of Abuse

#### 1. John Doe 1

John Doe 1 began cheering for an All Star team in California while in the sixth grade. (Id. ¶ 201, ECF No. 8.) In 2017, he joined a "Level 4 BlackJacks team" after moving to Las Vegas. (Am. Compl. ¶ 203, ECF No. 8.) John Doe 1 first learned of Scott Foster around this time through Foster's "reputation in the [Varsity] community" and his social media presence. (Id. ¶¶ 205-06, ECF No. 8.) After John Doe 1 followed Foster on social media, Foster followed John Doe 1 back and began sending him direct messages. (Id. ¶¶ 207, 209, ECF No. 8.) The two exchanged direct messages for about a month leading up to a Varsity tournament in 2019 in

which John Doe 1 was to compete.  (Id. ¶ 210, ECF No. 8.)  At some point, Foster asked John

Doe 1 for his cell phone number and later text messaged him about meeting at the tournament.

(Id. ¶ 210, ECF No. 8.)  John Doe 1 – who was sixteen at the time – understood from the "tone

and tenor of the communications" that Foster was soliciting him to engage in sexual conduct.

(Am. Compl. ¶¶ 211, 221, ECF No. 8.)  John Doe 1 "felt uncomfortable with the exchange but

also felt uncomfortable ceasing communications with such an important figure in the

competitive cheer community."  (Id. ¶ 212, ECF No. 8.)  John Doe 1 and Foster allegedly

exchanged nude photographs of themselves and "had their first sexual encounter" at the

tournament.  (Id. ¶¶ 213-14, 218, ECF No. 8.)  John Doe 1 asserts that they had a second sexual

encounter in May 2019 at another Varsity tournament where Foster performed oral sex on and

received oral sex from John Doe 1.  (Id. ¶¶ 219-20, ECF No. 8.)

### 2. John Doe 2

John Doe 2 began cheering around 2013 when he was in the eighth grade.  (Id. ¶ 228,

ECF No. 8.)  He joined Rockstar after moving to Greenville in 2014.  (Am. Compl. ¶ 229, ECF

No. 8.)  Almost immediately, Defendants Tracy a/k/a or f/k/a Traevon Black ("Black") and Peter

Holley ("Holley") allegedly "began making inappropriate and vulgar comments to him."  (Id.

¶ 230, ECF No. 8.)  When he was sixteen, John Doe 2 claims that he was pressured into sending

nude photographs to Black and Holley.  (Id. ¶¶ 231-32, ECF No. 8.)  John Doe 2 also claims that

he was pressured into going to the "Rockstar house" – a house paid for by Scott and Kathy

Foster where Rockstar coaches "host[ed] parties, d[id] drugs, and dr[a]nk alcohol with the minor

athletes."  (Id. ¶¶ 234, 236, ECF No. 8.)  One time, John Doe 2 went to the Rockstar house at the

request of an unidentified coach who purportedly "tried to engage in oral sex" with John Doe 2

6

and forced him to watch pornographic videos.  (Id. ¶ 237, ECF No. 8.)  John Doe 2 also asserts

that another unnamed Rockstar coach, "who was at least twice Plaintiff John Doe 2's age,"

invited him over to the Rockstar house and offered him marijuana and alcohol.  (Am. Compl.

¶ 239, ECF No. 8.)  John Doe 2 maintains that Scott and Kathy Foster knew about and condoned

this behavior and that it "was actually encouraged as a way of ensuring that the athletes

remained at Rockstar."  (Id. ¶ 240, ECF No. 8.)

### 3. Jane Doe 1

Jane Doe 1 began cheering for the Carolina All-Stars while in the seventh grade.  (Id.

¶ 244, ECF No. 8.)  When she was fifteen, she was placed on Scott Foster's team.  (Id. ¶¶ 245-

46, ECF No. 8.)  Jane Doe 1 claims that Foster "immediately began grooming her."  (Id. ¶ 246,

ECF No. 8.)  For example, she alleges that Foster would spend "hours talking to her about other

athletes' sex lives" and asked whether she had "any interest in engaging in certain sexual

activity, including anal sex."  (Am. Compl. ¶ 246, ECF No. 8.)  Jane Doe 1 states that these

discussions made her "extremely uncomfortable, but at the same time created an artificial sense

of closeness with . . . Foster."  (Id. ¶ 246, ECF No. 8.)  When Jane Doe 1 was seventeen, Foster

offered to use his connections with the University of Louisville to help with her recruitment.

(Id. ¶ 247, ECF No. 8.)  Accordingly, Jane Doe 1 traveled with Scott and Kathy Foster to one

Varsity tournament a day early to visit the University of Louisville.  (Id. ¶ 248, ECF No. 8.)

Upon arriving at the team hotel, Jane Doe 1 realized she forgot a toothbrush, so she called Scott

Foster, who brought one to her room.  (Id. ¶ 249, ECF No. 8.)  She claims that Foster then sat on

her bed and made a sexual advance toward her.  (Am. Compl. ¶ 249, ECF No. 8.)

6222-cv-02957-HMH    Date Filed 06/21/23    Entry Number 187    Page 8 of 41

### 4. Jane Doe 2

Jane Doe 2 started cheering when she was five years old.  (Id. ¶ 251, ECF No. 8.)  While at Varsity's World Championship Event during the 2018 season, then fifteen-year-old Jane Doe 2 was introduced to an unidentified male coach who "repeatedly attempted to force [her] to engage in sexual acts," even though "she was clearly underage" and "repeatedly told him no." (Id. ¶¶ 252-53, ECF No. 8.)  Jane Doe 2 began competing for Rockstar in 2019 while commuting from her home in North Carolina.  (Id. ¶ 255, ECF No. 8.)  During one of her first Rockstar practices, she trained with Scott Foster, "who complimented her on her looks, and began almost immediately to touch her inappropriately."  (Id. ¶ 256, ECF No. 8.)  Jane Doe 2 also spent the night at Foster's house twice in the following months at his invitation; each time, she alleges, Foster gave her "drugs and alcohol."  (Am. Compl. ¶ 257, ECF No. 8.)  Jane Doe 2 further alleges that she "was provided alcohol and drugs on numerous occasions while she cheered with Rockstar, including during competitions hosted by [Varsity] and overseen by [USASF]."  (Id. ¶ 258, ECF No. 8.)  She specifically "recalls going to a party with other athletes at the penthouse of one of the Varsity-selected hotels" where she drank alcohol with Foster.  (Id. ¶ 259, ECF No. 8.)  Jane Doe 2 states that this culture of alcohol and drug use "created an environment where the athletes' inhibitions were down" and "created a sense of sexual availability between the adult coaches and the child-athletes."  (Id. ¶ 260, ECF No. 8.)

### 5. Jane Doe 3

Jane Doe 3 started cheering for Carolina All Stars at the age of nine.  (Id. ¶ 267, ECF No. 8.)  Scott Foster became her coach when she was eleven years old.  (Am. Compl. ¶ 268, ECF No. 8.)  During one cheer competition when she was sixteen years old, Foster assigned

8

Jane Doe 3 to share a room with multiple people, including an adult coach, Defendant Kenny

Feeley ("Feeley"). (Id. ¶¶ 270-72, ECF No. 8.) She alleges that Feeley climbed into her bed,

"groped and fondled her, and digitally penetrated her." (Id. ¶ 272, ECF No. 8.) Sometime later,

Foster arranged for Jane Doe 3 to receive private training from Feeley. (Id. ¶ 273, ECF No. 8.)

But rather than provide instruction, Feeley allegedly took Jane Doe 3 to his apartment and

supplied her with alcohol and marijuana, before taking her to another location and raping her.

(Id. ¶ 274, ECF No. 8.) Jane Doe 3 states that Foster would make comments about the alleged

rape while at practice, "insinuating that [he] knew what happened." (Am. Compl. ¶ 276, ECF

No. 8.) Jane Doe 3 ultimately quit cheerleading because of these incidents. (Id. ¶ 275, ECF

No. 8.) While she was still cheering, however, she often spent time at Scott and Kathy Foster's

home, "where they would all get in a hot tub together and the Fosters would provide [her] with

alcohol." (Id. ¶ 278, ECF No. 8.) "Jane Doe 3 also recalls parties that took place at the Varsity

competitions where she and the other young athletes were given alcohol." (Id. ¶ 279, ECF

No. 8.)

### 6. Jane Doe 4

Jane Doe 4 began cheering when she was nine years old. (Id. ¶ 281, ECF No. 8.) In

2019, when she was eighteen, "she left her smaller gym in Alabama to try out for Rockstar."

(Am. Compl. ¶ 282, ECF No. 8.) Jane Doe 4 was placed on a "Worlds' level team" and

attended her first competition on behalf of Rockstar – Varsity's Battle Under the Bigtop – in

December 2019. (Id. ¶¶ 285-86, ECF No. 8.) Jane Doe 4 states that after the first day of the

competition, Scott Foster invited her to his hotel room and served her alcohol. (Id. ¶ 288, ECF

No. 8.) Jane Doe 4 additionally claims that Foster and other Rockstar coaches provided her and

other athletes with alcohol on the last night of competition.  (Id. ¶ 289, ECF No. 8.)  That same night, Jane Doe 4 alleges that Foster kissed her in a stairwell while the two were going outside to smoke a cigarette.  (Id. ¶ 290, ECF No. 8.)  Within a few months after the tournament, Foster and Jane Doe 4 "were seeing one another several times a week."  (Am. Compl. ¶ 291, ECF No. 8.)  Foster regularly served her alcohol and solicited sex from her, often while they were staying at hotels for Varsity competitions.  (Id. ¶ 292, ECF No. 8.)  Jane Doe 4 later started working for Foster at some point and, during this time, "felt that she could not deny Defendant Foster sex, or she would be punished professionally."  (Id. ¶¶ 293, 298, ECF No. 8.)  For example, she alleges that Foster once threatened to change her employment status from salaried to hourly after she declined to travel out of town with him.  (Id. ¶ 293, ECF No. 8.)

### 7. Jane Doe 5

Jane Doe 5 cheered for Rockstar as a fifteen-year-old.  (Id. ¶ 299, ECF No. 8.)  She alleges that Defendant Josh Guyton ("Guyton"), a "co-ed stunter and tumbling coach," often touched her inappropriately during practice.  (Am. Compl.  ¶¶ 300-01, ECF No. 8.)  Guyton once purportedly "put his hands on Jane Doe 5's upper thighs and questioned her about whether she shaved her bikini area."  (Id. ¶ 301, ECF No. 8.)  Guyton also often invited Jane Doe 5 to his apartment across from the gym "so that she could work on her homework in a quiet place nearby."  (Id. ¶ 302, ECF No. 8.)  On one occasion when Jane Doe 5 was at his apartment, Guyton allegedly "lured Jane Doe 5 to his bedroom where he proceeded to touch Jane Doe 5 in a sexual and inappropriate way, tickling her and attempting to 'cuddle' her."  (Id. ¶ 303, ECF No. 8.)  Jane Doe 5 states that this "predatory, grooming behavior" was "so normalized and so

10

frequent" that it was not until she confided in her mother about Guyton's conduct that she "recognized it as abuse."  (Id. ¶ 304, ECF No. 8.)

### 8. Jane Doe 6

Jane Doe 6 met Scott Foster when she was eighteen years old.  (Am. Compl. ¶ 306, ECF No. 8.)  After meeting Foster, she was invited to attend a cheer skills camp in Miami, Florida. (Id. ¶ 307, ECF No. 8.)  One night during the trip, she claims that Foster gave her "a capful of liquid" he called "G," which according to Foster, was "a substance used by body builders to make them look more muscular before a competition."  (Id. ¶¶ 307-08, ECF No. 8.)  Foster then purportedly took her to a nightclub, where they spent time in a VIP section.  (Id. ¶ 309, ECF No. 8.)  Jane Doe 6 has "limited memory" of what happened next and was told by teammates that "she passed out on the couch in the VIP section, vomited on several occasions in several locations, and had to be showered."  (Id. ¶¶ 311-12, ECF No. 8.)  Jane Doe 6 also claims that Foster forced her to drink "a half-capful of 'G'" another night during the trip.  (Am. Compl. ¶ 313, ECF No. 8.)  After drinking the liquid the second time, she "sat down on a hotel bed and thereafter has no further memory from the evening."  (Id. ¶ 313, ECF No. 8.)  Jane Doe 6 now speculates that the liquid that Foster gave her was GHB or gamma-hydroxybutyrate – more commonly known as the "date rape drug."  (Id. ¶ 314, ECF No. 8.)

### 9. Jane Doe 7

Jane Doe 7 began cheering for Rockstar when she was thirteen years old.  (Id. ¶ 317, ECF No. 8.)  During her time at Rockstar, she states that she "witnessed a culture of rampant drug use, underage alcohol consumption, sexual harassment and abuse."  (Id. ¶ 318, ECF No. 8.) Jane Doe 7 was coached by Kathy Foster, who purportedly "withh[e]ld[] water from athletes"

11

during training and subjected them to "excessive physical punishment and conditioning," "verbal abuse," "bullying," and "body shaming." (Am. Compl. ¶ 320, ECF No. 8.) Jane Doe 7 also alleges that she was sexually abused by two Rockstar coaches – Defendants Nathan Allan Plank ("Plank") and Christopher Hinton ("Hinton"). Jane Doe 7 claims that Plank, a twenty-four-year-old adult, "often grope[d] and touch[ed] [her] in an inappropriate way during stunting" and sent her multiple unsolicited nude photographs and videos of himself masturbating. (Id. ¶¶ 322-27, ECF No. 8.) Jane Doe 7 felt "powerless" to stop Plank's behavior, "for fear that she would be demoted in the program or otherwise punished in a way that would negatively impact her cheer career." (Id. ¶ 328, ECF No. 8.)

When Jane Doe 7 was fourteen, she was approached by twenty-five-year-old Hinton. (Id. ¶ 329, ECF No. 8.) Hinton persuaded Jane Doe 7 to watch a movie with him one night, during which he questioned her about her sex life. (Id. ¶ 330, ECF No. 8.) "Jane Doe 7 recalls feeling uncomfortable, but conflicted as to how to respond" since she saw him "as an authority figure in the gym, a coach[,] and a person with a large social media presence and following." (Am. Compl. ¶ 330, ECF No. 8.) That same night, Hinton allegedly forced Jane Doe 7 to perform oral sex on him. (Id. ¶ 331, ECF No. 8.) Jane Doe 7 was initially hesitant to report what happened yet eventually told her mother and sought counseling. (Id. ¶¶ 332-33, ECF No. 8.) Her mother reported the alleged abuse to the Greenville County Sheriff's Department as well as to USASF and Varsity. (Id. ¶ 334, ECF No. 8.) Jane Doe 7 maintains that her mother's complaints "were dismissed as an attempt to manipulate her daughter's position on the cheer team" and that her mother was told "that if she did not like what she was seeing or experiencing at Rockstar, she could 'find another gym.'" (Id. ¶ 335, ECF No. 8.) Jane Doe 7 ultimately quit

cheerleading because of these incidents and continues to suffer from anxiety, depression, and PTSD.  (Am. Compl. ¶¶ 336-37, ECF No. 8.)

### D. Procedural History

Plaintiffs filed their amended complaint on September 15, 2022.  Against USASF, they assert statutory claims under the Child Abuse Victims' Rights Act of 1986 ("CAVRA"), 18 U.S.C. § 2255; the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d); and the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C. Code Ann. § 39-5-20, along with common-law claims for gross negligence, negligent supervision, breach of contract, unjust enrichment, fraud, negligent security, and civil conspiracy.  (Am. Compl., ECF No. 8.)  On January 20, 2023, USASF moved to dismiss all claims asserted against it for failure to state a claim under Rule 12(b)(6).  (USASF Mot. Dismss, ECF No. 126.) Plaintiffs responded in opposition on February 3, 2023.  (Resp. Opp'n USASF Mot. Dismiss, ECF No. 144.)  USASF then filed its reply on February 17, 2023.[4] (USASF Reply, ECF No. 150.)  This matter is now ripe for decision.[5]

### II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678

---

[4] On March 1, 2023, Plaintiffs in the instant case filed a motion before the United States Judicial Panel on Multidistrict Litigation seeking to transfer all related, pending civil actions filed in districts throughout the United States. See Motion to Transfer, In re Varsity Spirit Athlete Abuse Litig., MDL No. 3077, ECF No. 1. The motion to transfer was denied on June 5, 2023. In re Varsity Spirit Athlete Abuse Litig., MDL No. 3077, 2023 WL 3828645 (J.P.M.L. June 5, 2023).

[5] Under Local Rule of Civil Procedure 7.08, the court may decide motions without a hearing.

13

(2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  This plausibility

standard is met "when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  <u>Id.</u> (citing

<u>Twombly</u>, 550 U.S. at 556).  "'[D]etailed factual allegations'" are not required, but the plaintiff

must present "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  <u>Id.</u>

(quoting <u>Twombly</u>, 550 U.S. at 555).  In reviewing the complaint, the court "must accept the

factual allegations of the complaint as true and construe them in the light most favorable to the

nonmoving party."  <u>Rockville Cars, LLC v. City of Rockville</u>, 891 F.3d 141, 145 (4th Cir.

2018).

### III. DISCUSSION

USASF has moved to dismiss all ten counts asserted against it for failure to state a claim.

The court will address each claim in turn.

### A. CAVRA Claim Under 18 U.S.C. § 2255 (Count I)

Congress enacted § 2255 as part of the CAVRA to address the "multi-million dollar"

child exploitation industry and the "lack [of] effective remedies" available to "exploitation

victims" "under Federal law."  Pub. L. No. 99-500, § 702, 100 Stat. 1783, 1783-74 (1986).

Section 2255 empowers victims of certain felonies related to sex trafficking, sexual abuse, and

the distribution of child pornography to recover damages for the harms caused by their abusers.

The statute reads:

> Any person who, while a minor, was a victim of a violation of section 1589, 1590,
> 1591, 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, or 2423
> of this title and who suffers personal injury as a result of such violation . . . may sue
> in any appropriate United States District Court and shall recover the actual damages
> such person sustains or liquidated damages in the amount of $150,000, and the cost
> of the action, including reasonable attorney's fees and other litigation costs

14

> reasonably incurred.  The court may also award punitive damages and such other preliminary and equitable relief as the court determines to be appropriate.

18 U.S.C. § 2255(a).  No criminal conviction is necessary to recover damages.  Prewett v. Weems, 749 F.3d 454, 458 (6th Cir. 2014) (reaching this conclusion after considering the plain meaning of the term "violation," distinct uses of "violation" and "conviction" in neighboring statutes, and civil RICO's violation requirement).  Rather, a plaintiff need only show that the defendant committed one of the enumerated offenses by a preponderance of the evidence.  Id.; Smith v. Husband, 376 F. Supp. 2d 603, 613 (E.D. Va. 2005); Doe v. Liberatore, 478 F. Supp. 2d 742, 755 (M.D. Pa. 2007).

> The amended complaint alleges that Plaintiffs
>
> were minors at the time they were sexually abused and assaulted, sexually exploited, transported across state lines for illegal sexual activity, and used in creating illegal and obscene digital materials in contravention of *18 U.S.C §§ 2241(c), 2242, 2243, 2251, 2251A, 2252, 2252A, 2260, 2421, 2422, and 2223*, thus constituting violations of 18 U.S.C. §2255.

(Am. Compl. ¶ 346, ECF No. 8) (emphasis added).  Plaintiffs claim that these acts were "enabled by the ongoing certification and ratification" of Varsity, USASF, USA Cheer, Bain, and Charlesbank since Rockstar Cheer was "held out" by those Defendants "as being part of a network of safe and trustworthy cheer coaching gyms."  (Id. ¶¶ 341, 345, ECF No. 8.)  As explained below, however, Plaintiffs have not stated a plausible claim for relief against USASF under § 2255.

To begin, notably absent from Plaintiffs' response to USASF's motion to dismiss is any discussion of the eleven predicate offenses cited in the amended complaint.  Plaintiffs instead spend several pages discussing only 18 U.S.C. §§ 1589 (forced labor) and 1591 (sex trafficking) – statutes that they did not include in their amended complaint.  The court cannot consider

claims raised for the first time in a response to a motion to dismiss.  2 James Wm. Moore,

Moore's Federal Practice § 12.34[2] (3d ed. 2022);  Mylan Labs., Inc. v. Akzo, N.V., 770

F.Supp. 1053, 1068 (D. Md. 1991) ("[I]t is axiomatic that the complaint may not be amended by

the briefs in opposition to a motion to dismiss."  (quoting Car Carriers, Inc. v. Ford Motor Co.,

745 F.2d 1101, 1107 (7th Cir. 1984))); Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc., 836

F.2d 173, 181 (3d Cir.1988) ("[L]egal theories set forth in [a] brief are helpful only to the extent

that they find support in the allegations set forth in the complaint.").  To hold otherwise would

effectively allow a party to circumvent the amendment requirements of Rule 15(a).[6]  See

Morgan Distrib. Co. v. Unidynamic Corp., 868 F.2d 992, 995 (8th Cir. 1989).

          In any event, Plaintiffs' § 2255 claim fails because they have not pled specific facts

suggesting that USASF itself committed any of the predicate offenses actually included in the

amended complaint.[7]  (Am. Compl. ¶¶ 200-338, ECF No. 8) (detailing allegations of abuse

committed by Defendants Scott Foster, Black, Holley, Guyton, Plank, Hinton, and other,

unidentified coaches); Upton v. Vicknair, No. 21-407, 2021 WL 2635460, at *5 (E.D. La. June

25, 2021) (unpublished) ("[A] claim under § 2255 is limited to a defendant [who] committed the

acts described in any of the listed offenses.  Because Plaintiff does not allege that the City

Defendants violated any of the enumerated statutes, this claim will be dismissed." (internal

quotation marks and citation omitted)).

---

          [6] Even if the court were to consider the new grounds for relief that Plaintiffs raise in
their response brief, Plaintiffs have not sufficiently alleged how USASF violated § 1589(b)
or § 1591(a)(2).

          [7] Plaintiffs are not pursuing a theory of vicarious liability against USASF.  See (Am.
Compl. ¶ 185, ECF No. 8) ("The unlawful acts alleged against Defendants Webb, Varsity,
USASF, and USA Cheer, and vicariously against Defendant Charlesbank and Defendant Bain
Capital in this Complaint . . . .")

Finally, to the extent Plaintiffs seek to hold USASF secondarily liable under an aiding-and-abetting theory, a plain reading of § 2255 and Supreme Court case law foreclose that argument.[8]

When interpreting a statute, the court begins, as always, with the statute's text.  United States v. Bryant, 949 F.3d 168, 174 (4th Cir. 2020).  The court "must presume that [Congress] says in a statute what it means and means in a statute what it says."  Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992).  "When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete."  Id. at 254 (internal quotation marks omitted).  Section 2255 makes no mention of secondary liability, which "by itself is an indication that Congress did not intend to permit such a theory."  Doe v. City of Gauley Bridge, No. 2:21-cv-00491, 2022 WL 3587827, at *13 (S.D. W. Va. Aug. 22, 2022) (unpublished); Boim v. Holy Land Found. for Relief & Dev., 549 F.3d 685, 689 (7th Cir. 2008) (en banc) (Posner, J.) ("[S]tatutory silence on the subject of secondary liability means there is none.").

To be sure, the court recognizes that a few other courts have read secondary liability into § 2255.  See Liberatore, 478 F. Supp. 2d at 756-57; Doe v. Schneider, No. 08-3805, 2013 WL 5429229, at *10 (E.D. Pa. Sept. 30, 2013) (unpublished) (following Liberatore); M.A. ex rel. P.K. v. Village Voice Media Holdings, LLC, 809 F. Supp. 2d 1041, 1053-54 (E.D. Mo. 2011)

---

[8] The federal aiding-and-abetting statute provides that "[w]hoever . . . aids, abets, counsels, commands, induces or procures [the commission of an offense against the United States] is punishable as a principal."  18 U.S.C. § 2(a).  USASF and the authorities on which it relies seem to conflate vicarious liability with aiding-and-abetting liability.  Vicarious liability allows a defendant to be held liable for the bad acts of another simply because of the defendant's relationship with the wrongdoer.  Restatement (Second) of Agency § 219 (Am. L. Inst. 1958).  On the other hand, aiding-and-abetting liability holds a defendant responsible for his own acts in helping the wrongdoer.  Rosemond v. United States, 572 U.S. 65, 71 (2014) ("[A] person is liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission.").

17

(same).  In doing so, however, those courts overlooked the Supreme Court's decision in <u>Central Bank, N.A. v. First Interstate Bank, N.A.</u>, 511 U.S. 164 (1994).  <u>Central Bank</u> concerned whether a private cause of action extends to suits against aiders and abettors of securities fraud under § 10(b) of the Securities and Exchange Act of 1934.  511 U.S. at 167.  The Court answered that question in the negative, reasoning that "Congress kn[ows] how to impose aiding and abetting liability when it cho[oses] to do so.  If . . . Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text.  But it did not."  <u>Id.</u> at 176-77 (internal citations omitted).  The Court went on to explain that because "Congress has not enacted a general civil aiding and abetting statute," "there is no general presumption that [a] plaintiff may also sue aiders and abettors" when Congress creates a private cause of action.  <u>Id.</u> at 182.

Central Bank's rationale is not limited to the context of federal securities laws, as "nothing in its holding turns on particular features of those laws."  <u>Boim</u>, 549 F.3d at 689; <u>see also</u> <u>Owens v. BNP Paribas, S.A.</u>, 897 F.3d 266, 277-78 (D.C. Cir. 2018) (relying on <u>Central Bank</u> in holding that the pre-Justice Against Sponsors of Terrorism Act version of 18 U.S.C. § 2333 does not permit aiding-and-abetting liability); <u>Freeman v. DirecTV, Inc.</u>, 457 F.3d 1001, 1006 & n.1 (9th Cir. 2006) (relying on <u>Central Bank</u> in holding that §§ 2702 and 2707 of the Electronic Communications Privacy Act do not allow for secondary liability).  As a result, the court finds the reasoning of <u>Central Bank</u> controlling and declines to read secondary liability into § 2255.

Based on the above, Plaintiffs have failed to state a § 2255 claim against USASF.  The court therefore grants USASF's motion to dismiss Count I.

**B. RICO Claims Under 18 U.S.C. § 1962(c), (d) (Count II)**

18 U.S.C. § 1964 provides a civil cause of action for "[a]ny person injured in his

business or property by reason of a violation" of RICO's substantive provisions found in § 1962.

Section 1962(c), in turn, prohibits "any person employed by or associated with any enterprise"

that engages in interstate commerce from "conduct[ing] or participat[ing], directly or indirectly,

in the conduct of such enterprise's affairs through a pattern of racketeering activity." To state a

claim under § 1962(c), then, a plaintiff must allege that the defendant (1) conducted (2) an

enterprise (3) through a pattern (4) of racketeering activity, Sedima, S.P.R.L. v. Imrex, Co., 473

U.S. 479, 496 (1985), and that the plaintiff suffered injury to "business or property" as a result,

Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc., 262 F.3d 260, 264 (4th Cir. 2001).

RICO's conspiracy provision, § 1962(d), makes it "unlawful for any person to conspire to

violate any of the provisions" of § 1962, including § 1962(c).

USASF challenges nearly every aspect of Plaintiffs' RICO claims under §§ 1962(c)

and (d). As explained below, the court finds that Plaintiffs have not plausibly alleged (1) RICO

standing, (2) an association-in-fact enterprise, or (3) that USASF conspired to commit a RICO

violation.

**1. RICO Standing**

RICO's standing requirement has two elements: injury to "business or property" and

causation. Brandenburg v. Seidel, 859 F.2d 1179, 1187 (4th Cir. 1988).

To begin, USASF correctly notes – and Plaintiffs do not appear to challenge – that any

personal injuries Plaintiffs may have suffered as a result of the alleged abuse cannot confer

RICO standing. Bast v. Cohen, Dunn & Sinclair, P.C., 59 F.3d 492, 496 (4th Cir. 1995)

("[A]llegation[s] of personal injury and pecuniary losses occurring therefrom are not sufficient to meet the statutory requirement of injury to 'business or property.'").  Plaintiffs, for their part, argue that their lost ability to cheer competitively and the dues and fees they paid Varsity and USASF are sufficient to satisfy RICO's standing requirement.  The court will discuss the sufficiency of these alleged harms in turn.

### a. Lost Ability to Cheer Competitively

Plaintiffs contend that they had an identifiable property interest in the "continued ability to cheer competitively," which would have allowed them to achieve and monetize social media fame, earn athletic scholarships, and perhaps one day become cheer coaches, gym owners, or event promoters themselves.  (RICO Case Statement 45, ECF No. 38.)  This argument lacks merit for two reasons.  First, any injuries that Plaintiffs might suffer from having their competitive cheerleading careers cut short are too speculative to constitute injury to business or property within the meaning of § 1964(c).  See Price v. Pinnacle Brands, 138 F.3d 602, 607 (5th Cir. 1998) ("Injury to mere expectancy interests or to an intangible property interest is not sufficient to confer RICO standing." (internal quotation marks omitted)).  Plaintiffs had, at best, mere expectancy interests in "realizing future financial and business opportunities in which [they] and their famil[ies] invested."  (RICO Case Statement 46, ECF No. 38); see, e.g., Bowen v. Adidas Am., Inc., 541 F. Supp. 3d 670, 679-80 (D.S.C. 2021) (holding that a former college basketball player had an "unrecoverable expectancy interest . . . . in the supposed lost professional earnings he hoped to obtain as a first-round NBA draft pick"); Strates Shows, Inc. v. Amusements of Am., Inc., 379 F. Supp. 2d 817, 827-28 (E.D.N.C. 2005) (finding that plaintiff lacked a property interest in the expectation of a contract even though plaintiff had been

20

awarded the contract "as a matter of course in past years"); In re Taxable Mun. Bond Sec. Litig., 51 F.3d 518, 523 (5th Cir. 1995) ("Anderson's suit shows only a lost opportunity to obtain a . . . loan. Such lost opportunity by itself does not constitute an injury that confers standing to bring a RICO cause of action.").

Second, even if Plaintiffs had incurred concrete losses from being unable to continue cheerleading, those losses could not confer RICO standing, as they would be derivative of non-compensable personal injuries – that is, those stemming from the alleged sexual abuse Plaintiffs suffered. RICO's "injury to business or property" requirement excludes from its reach not only personal injuries, but also "pecuniary losses occurring therefrom." Bast, 59 F.3d at 495; Doe v. Roe, 958 F.2d 763, 768-70 (7th Cir. 1992) (miscellaneous expenses flowing from mental distress caused by arrangement in which plaintiff was coerced into paying for legal fees with sexual services not actionable under RICO); Grogan v. Platt, 835 F.2d 844, 848 (11th Cir. 1988) (economic damages, including loss of income, resulting from murder not actionable).

For these reasons, Plaintiffs cannot state a RICO claim based on any damages resulting from their lost ability to compete in competitive cheerleading.

### b. Membership Dues and Fees

Next, Plaintiffs claim that they have RICO standing based on the "membership dues, fees, and other incidental costs they paid to Defendants." (RICO Case Statement 46, ECF No. 38.)

As an initial matter, the court finds that the sums Plaintiffs paid to become USASF members and compete in Varsity events are sufficient to satisfy RICO's "business or property" requirement. See Reiter v. Sonotone Corp., 442 U.S. 330, 338 (1979) ("Money, of course, is a

form of property.").  With that said, to establish RICO standing, Plaintiffs must also show that

Defendants' predicate acts were both the but-for and proximate cause of their alleged injuries.

Hemi Grp., LLC v. City of New York, N.Y., 559 U.S. 1, 9 (2010).

USASF contends that Plaintiffs cannot show causation, citing Gilbert v. U.S. Olympic

Comm., No. 18-cv-00981-CMA-MEH, 2019 WL 1058194 (D. Colo. Mar. 6, 2019)

(unpublished), Report and Recommendation adopted in relevant part by 423 F. Supp. 3d 1112

(D. Colo. 2019).  The plaintiffs in Gilbert were female taekwondo athletes who allegedly

suffered sexual abuse while competing in the USA Taekwondo ("USAT") system.  Id. at *1.  In

support of their RICO claim, the plaintiffs argued that they had RICO standing based in part on

the $50 annual membership fee they each paid the USAT.  Id. at *24.  The court rejected that

argument, reasoning that "Plaintiffs paid $50 in dues to be members of USAT" and "participate

in USAT-sanctioned events," not because of the defendants' predicate acts.  Id. at *25.  A

similar conclusion is warranted in this case.

"When a court evaluates a RICO claim for proximate causation, the central question it

must ask is whether the alleged violation led *directly* to the plaintiff's injuries."  Anza v. Ideal

Steel Supply Corp., 547 U.S. 451, 461 (2006) (emphasis added).  In other words, the focus is not

"on whether the harm to the RICO plaintiff was a foreseeable result of the defendant's conduct

or even whether it was 'the intended consequence[] of [that] behavior,' but rather on 'the

directness of the relationship between the conduct and the harm.'"  Slay's Restoration, LLC v.

Wright Nat'l Flood Ins. Co., 884 F.3d 489, 493 (4th Cir. 2018) (emphases removed) (quoting

Hemi Grp., 559 U.S. at 12).

In their RICO case statement, Plaintiffs state that "[t]he actions of the Enterprise and its conspirators were the direct and proximate cause of [their] injuries." (RICO Case Statement 46, ECF No. 38.) Those allegations, however, are precisely the sort of "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," that the court need not accept. Iqbal, 556 U.S. at 678. Moreover, although Plaintiffs claim that "[b]ut for the fraudulent assurances to their parents that the gyms and coaches were certified safe, *the abuse* would not have occurred," (RICO Case Statement 46, ECF No. 38) (emphasis added), nowhere do any of the nine Plaintiffs allege that they paid dues and fees as a direct result of any party's purported misrepresentations.[9] Rather, Plaintiffs seemingly paid membership dues and competition fees out of necessity to participate in events sanctioned by USASF and Varsity. See (Am. Compl. ¶ 51, ECF No. 8) ("Defendant Webb, through Defendant Varsity, founded

---

[9] To be sure, a plaintiff asserting a RICO claim based on wire or mail fraud "need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 661 (2008). The plaintiffs in Bridge were regular participants in a county's tax lien auctions who alleged that the defendants' false attestations of compliance with the county's rule prohibiting simultaneous bidding deprived them of their fair share of winning bids. Id. 642-44. The Court held that the plaintiffs' RICO claims could proceed even though the defendants' misrepresentations were directed to and relied on by the county – and not the plaintiffs. The Court clarified, however, that

> none of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations. . . . In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation.

Id. at 658 (emphasis in original). In contrast to Bridge, this case does not present a third-party reliance scenario. Thus, if Plaintiffs (or their parents) did not rely on Defendants' alleged misrepresentations in paying Plaintiffs' membership dues and competition fees, Plaintiffs could not have been injured by reason of Defendants' alleged fraudulent scheme. After all, "a misrepresentation can cause harm only if a recipient of the misrepresentation relies on it." Id. at 656 n.6.

Defendant USASF, and mandated that All-Star athletes purchase a USASF membership as a requirement to competing at Varsity-sponsored events."); (Id. ¶ 56, ECF No. 8) ("All-Star athletes competing on behalf of Varsity-associated gyms pay monthly or annual fees to the gym as well as annual fees to the Varsity Defendants for competition attendance, uniforms, accessories, and other related fees." ); (Id. ¶¶ 223, 243, 250, 266, 280, 298, 305, 316, 338, ECF No. 8); see also Gilbert, 2019 WL 1058194, at *25.

Thus, having not adequately alleged that they were injured "by reason" of Defendants' predicate acts, Plaintiffs cannot state a RICO claim based on the "membership dues, fees, and other incidental costs they paid to Defendants." (RICO Case Statement 46, ECF No. 38.)

### 2. Enterprise

Even if Plaintiffs could establish RICO standing, their § 1962(c) claim would still be subject to dismissal for failure to plausibly allege the existence of an association-in-fact enterprise.

A RICO enterprise "includes any . . . group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "Such a group need not have a hierarchical structure or a 'chain of command'" or business-like characteristics such as "a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." Boyle v. United States, 556 U.S. 938, 948 (2009). Rather, "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Id. at 946.

24

Plaintiffs allege that all named Defendants formed an association-in-fact enterprise to "endanger[] the Plaintiffs as minor athletes by exposing them to illegal sexual abuse and exploitation" all while charging them dues and fees "to compete in the self-same system of abuse." (RICO Case Statement 35-36, ECF No. 38). Plaintiffs, though, have pled no facts to suggest that the Rockstar Cheer coaches shared a common purpose with the Varsity Defendants, USASF, USA Cheer, Webb, Bain, and Charlesbank. Indeed, based on the facts alleged in Plaintiffs' amended complaint and RICO case statement, the individual coaches and corporate entities had divergent goals: the coaches sought to prey on minor athletes for their own sexual or personal gratification; the corporate entities sought to retain athletes and attract new ones to generate more money. Cf. Baker v. IBP, Inc., 357 F.3d 685, 691 (7th Cir. 2004) (Easterbrook, J.) (no common purpose where employer allegedly hired undocumented workers to depress wages because the employer "want[ed] to pay lower wages," "the recruiters want[ed] to be paid more for services rendered," and the immigrant-welfare organization "want[ed] to assist members of its ethnic group"); McPeters v. Edwards, 806 F. Supp. 2d 978, 988-89 (S.D. Tex. 2011) (no common purpose because the defendant judge's "purpose in ordering e-filing was to encourage efficiency, while LexisNexis's purpose was to generate profits"); Marshall v. Goguen, Cv 21-19-M-DWM, 2022 WL 1641776, *17 (D. Mont. May 24, 2022) (unpublished) (no common purpose because one defendant "sought to preserve his reputation, while [other defendants] sought to financially benefit off him"), appeal filed, 22-35499 (9th Cir. June 27, 2022). It strains credulity to suggest, as Plaintiffs do, that Varsity, its corporate parents, and cheerleading's governing bodies intended to subject the very athletes they relied on as a major

revenue source to "illegal sexual abuse and exploitation" as a means of generating further profits.  (RICO Case Statement 35-36, ECF No. 38.)  In short, without nonconclusory allegations that USASF shared a common purpose with the perpetrators of the alleged abuse, Plaintiffs have failed to allege a RICO enterprise.

### 3. RICO Conspiracy

Plaintiffs' RICO conspiracy claim against USASF under § 1962(d) is also deficient. Because Plaintiffs lack RICO standing and have not adequately alleged the existence of a RICO enterprise, they cannot assert a § 1962(c) claim against any Defendant.  Without a viable § 1962(c) claim, their conspiracy claim under § 1962(d) necessarily fails, too.  GE Inv. Priv. Placement Partners II v. Parker, 247 F.3d 543, 551 n.2 (4th Cir. 2001); Foster v. Wintergreen Real Est. Co., 363 F. App'x 269, 275 n.6 (4th Cir. 2010) (unpublished).

Even if Plaintiffs had sufficiently alleged a substantive RICO violation, their § 1962(d) claim would still be subject to dismissal for failure to state a claim.  "To satisfy § 1962(d), the plaintiff must establish two elements: (1) that two or more people agreed that some member of the conspiracy would commit at least two racketeering acts (i.e. a substantive RICO offense) and, (2) that the defendant knew of and agreed to the overall objective of the RICO offense." Borg v. Warren, 545 F. Supp. 3d 291, 319 (E.D. Va. 2021).  In describing the alleged conspiracy, Plaintiffs state that Defendants "operated as a single unified entity with the common goal of taking billions of dollars from minor athletes who wanted to be a part of Defendants' All-Star cheer world" and that Defendants "act[ed] as a collective group" in "endangering the Plaintiffs."  (RICO Case Statement 44-45, ECF No. 38.)  Apart from these conclusory allegations, Plaintiffs have alleged no facts tending to show that each Defendant agreed that

some member of the conspiracy would commit at least two racketeering acts.  See Chambers v. King Buick GMC, LLC, 43 F. Supp. 3d 575, 607 (D. Md. 2014) ("[B]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." (quoting Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 25 (2d Cir. 1990))); Walters v. McMahen, 795 F. Supp. 2d 350, 355 (D. Md. 2011) (stating that a plaintiff bringing a § 1962(d) claim must "describe in detail the conspiracy, including the identity of the co-conspirators, the object of the conspiracy, and the date and substance of the conspiratorial agreement").

For these reasons, Plaintiffs have failed to state a valid § 1962(d) claim against USASF. The court therefore grants USASF's motion to dismiss Count II in its entirety.

### C. SCUTPA Claim Under S.C. Code Ann. § 39-5-20(a) (Count III)

SCUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  S.C. Code Ann. § 39-5-20(a).  To state a SCUTPA claim, Plaintiffs must allege that (1) USASF "engaged in an unfair or deceptive act in the conduct of trade or commerce"; (2) "the unfair or deceptive act affected public interest"; and (3) Plaintiffs "suffered monetary or property loss as a result of [USASF's] unfair or deceptive act(s)."  Maybank v. BB&T Corp., 787 S.E.2d 498, 512 (S.C. 2016).

USASF contends that Plaintiffs' SCUTPA claim should be dismissed because Plaintiffs have not "specifie[d] a practice or action on the part of USASF that 'deceived' [them]." (USASF's Mem. Supp. Mot. Dismiss 20, ECF No. 126-1.)  Plaintiffs respond that they have satisfied the deceptive act requirement based on their allegations that USASF misrepresented its role as "the safety and oversight branch of the Varsity network."  (Resp. Opp'n USASF Mot.

27

Dismiss 24, ECF No. 144); (Am. Compl. ¶¶ 377, 379, ECF No. 8) (alleging that USASF "promis[ed] safe environments and vetted coaches" and "failed . . . to take corrective actions" when faced with abuse allegations).

Although SCUTPA does not define what qualifies as a "deceptive" act, it provides that courts "will be guided by" Federal Trade Commission ("FTC") and federal court interpretations of § 5(a)(1) of the Federal Trade Commission Act. S.C. Code Ann. § 39-5-20(b). A practice is deceptive for § 5(a)(1) purposes if it is material and "likely to mislead" a reasonable consumer. In re Cliffdale Assocs., Inc., 103 F.T.C. 110, 1984 WL 565319, at *37 (1984). Under this "likely to mislead" standard, the FTC is not required to show proof of actual consumer deception. Id.; see also Trans World Accounts, Inc. v. F.T.C., 594 F.2d 212, 214 (9th Cir. 1979); Thiret v. F.T.C., 512 F.2d 176, 180 (10th Cir. 1975). The same is true when the South Carolina Attorney General brings a SCUTPA enforcement action. State ex rel. Wilson v. Ortho-McNeil-Janssen Pharm., Inc., 777 S.E.2d 176, 189, 192 (S.C. 2015) ("[I]n an enforcement action brought by the Attorney General, there is no actual impact requirement.").

In contrast, a private litigant bringing a SCUTPA claim must show actual injury and a "causal connection" between that injury and the complained-of deceptive act. Id. (explaining that S.C. Code Ann. § 39-5-140(a) imposes "a requirement beyond the tendency to deceive element"). Establishing this causal connection in a misrepresentation case necessarily requires proof that the plaintiff detrimentally relied on the defendant's deceptive conduct. See Hageman v. Twin City Chrysler-Plymouth, Inc., 681 F. Supp. 303, 308-09 (M.D.N.C. 1988) (applying North Carolina law and stating that "[t]o prove actual causation, a plaintiff must prove that he or she detrimentally relied on the defendant's deceptive statement or misrepresentation. . . . [A]

28

private plaintiff cannot recover in an action for a deceptive trade practice if the plaintiff is unable to prove that the deceptive practice worked.").  It is at this step that Plaintiffs' SCUTPA claim fails.

Setting aside whether USASF's conduct was deceptive within the meaning of SCUTPA, the amended complaint contains no allegations that Plaintiffs actually relied on USASF's safety representations in deciding to become dues-paying members of USASF.  The amended complaint does not specify which of USASF's representations Plaintiffs encountered (or when they did), nor does it even allege that Plaintiffs would have acted differently had they known the truth of USASF's representations related to its role as Varsity's "safety and oversight branch." (Resp. Opp'n USASF Mot. Dismiss 24, ECF No. 144.)  Because Plaintiffs have not adequately alleged a causal nexus between their payment of dues to USASF, on the one hand, and USASF's purported deceptive conduct, on the other, Plaintiffs cannot maintain their SCUTPA claim. Thus, the court grants USASF's motion to dismiss Count III.

### D. Gross Negligence and Negligent Security (Counts IV and XI)

A negligence claim consists of three elements: "(1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach."  Carolina Chloride, Inc. v. Richland Cnty., 714 S.E.2d 869, 873 (S.C. 2011) (quoting Tanner v. Florence Cnty. Treasurer, 521 S.E.2d 153, 158 (S.C. 1999)).  "If any of these elements is absent a negligence claim is not stated."  Summers v. Harrison Constr., 381 S.E.2d 493, 495 (S.C. Ct. App. 1989).

"Gross negligence is the intentional conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do."

Etheredge v. Richland Sch. Dist. One, 534 S.E.2d 275, 277 (S.C. 2000).  In other words, "[i]t is the failure to exercise slight care."  Id.  "In most cases, gross negligence is a factually controlled concept whose determination best rests with the jury."  Faile v. S.C. Dep't of Juv. Just., 566 S.E.2d 536, 545 (S.C. 2002).  But "when the evidence supports but one reasonable inference, the question becomes a matter of law for the court."  Etheredge, 534 S.E.2d at 277.

USASF argues that Plaintiffs' gross-negligence and negligent-security claims must be dismissed because it did not owe Plaintiffs a duty.

"An affirmative legal duty exists only if created by statute, contract, relationship, status, property interest, or some other special circumstance."  Hendricks v. Clemson Univ., 578 S.E.2d 711, 714 (S.C. 2003).  South Carolina law recognizes that "there is no general duty to control the conduct of another or to warn a third person or potential victim of danger."  Madison v. Babcock Ctr., Inc., 638 S.E.2d 650, 656 (S.C. 2006).  There are, however, five exceptions to this general rule:

> (1) where the defendant has a special relationship to the victim; (2) where the defendant has a special relationship to the injurer; (3) where the defendant voluntarily undertakes a duty; (4) where the defendant negligently or intentionally creates the risk; and (5) where a statute imposes a duty on the defendant.

Id.  Plaintiffs argue that the second, third, and fourth exceptions apply.  (Resp. Opp'n USASF Mot. Dismiss 26-29, ECF No. 144.)

The second exception arises "when the defendant 'has the ability to monitor, supervise and control an individual's conduct' and when "'the individual has made a specific threat of harm directed at a specific individual.'"  Doe v. Marion, 645 S.E.2d 245, 250 (S.C. 2007) (emphasis added) (quoting Bishop v. S.C. Dep't of Mental Health, 502 S.E.2d 78, 81 (S.C. 1998)).  Plaintiffs cannot rely on this exception to establish a duty because, regardless of

whether USASF had the ability to control the individual coaches' conduct, nothing in the

amended complaint suggests that USASF was aware of a specific threat of harm aimed at a

specific Plaintiff.  See id.  ("[I]t is not simply foreseeability of the victim which gives rise to a

person's liability for failure to warn; rather, it is the person's awareness of a distinct, specific,

overt threat of harm which the individual makes towards a particular victim." (quoting Gilmer v.

Martin, 473 S.E.2d 812, 814 (S.C. Ct. App. 1996))).

Turning next to the third exception, South Carolina follows the negligent-undertaking

rule set forth in § 323 of the Restatement (Second) of Torts.  Wright v. PRG Real Est. Mgmt.,

826 S.E.2d 285, 290-91 (S.C. 2019).  Section 323 states:

> One who undertakes, gratuitously or for consideration, to render services to another
> which he should recognize as necessary for the protection of the other's person or
> things, is subject to liability to the other for physical harm resulting from his failure
> to exercise reasonable care to perform his undertaking, if
> > (a) his failure to exercise such care increases the risk of such harm, or
> > (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (Am. Law. Inst. 1965).

As for the fourth exception, a duty may arise when "a defendant creates 'a situation that

[it] knew or should have known posed a substantial risk of injury' to a plaintiff."  In re

Blackbaud, Inc., Customer Data Breach Litig., 567 F. Supp. 3d 667, 682 (D.S.C. 2021) (quoting

Edwards v. Lexington Cnty. Sheriff's Dep't, 688 S.E.2d 125, 130 (S.C. 2010)).  In light of these

principles, the court finds that Plaintiffs have alleged facts sufficient to show that USASF owed

them a duty of care under the third and fourth exceptions.

The amended complaint alleges that USASF – as All Star cheer's sanctioning body –

was "responsible for the safety, health, and welfare" of Plaintiffs, who were required to become

USASF members to compete in Varsity events.  (Am. Compl. ¶¶ 51, 59, 86, 386, ECF No. 8.)

31

Plaintiffs state that USASF and other Defendants knew of the "dangers" posed by the competitive cheerleading environment and thus "created rules specifically intended to address the risks of sexual, physical, and mental exploitation of minor athletes by coaches[] and adults." (Id. ¶¶ 387-88, ECF No. 8).  Yet, despite that knowledge and those guidelines, Defendants (including USASF) allegedly failed to vet coaches, investigate and report complaints of sexual abuse, and enforce rules related to "chaperoning and supervis[ing] minors" and banning coaches.  (Id. ¶¶ 126, 155, 157-160, 167, 169, 199, ECF No. 8.)  For example, Plaintiffs allege that Scott Foster was allowed to maintain contact with athletes while serving a USASF-imposed suspension for drinking alcohol with minors.  (Id. ¶¶ 117-18, 149, ECF No. 8.)  Other coaches accused of abuse, such as Holley and Feeley, were purportedly allowed to "quietly. . . relocate to a new gym or facility without parents knowing about the allegations of misconduct."  (Id. ¶¶ 126-28, ECF No. 8.)  In some cases, Plaintiffs allege, USASF "ignored" complaints altogether.  (Am. Compl. ¶¶ 126, ECF No. 8); see also (id. ¶ 335, ECF No. 8) (alleging that "Jane Doe 7's mother's complaints [to USASF and Varsity] were dismissed as an attempt to manipulate her daughter's position on the cheer team and in the gym").

Based on these allegations, the court finds that Plaintiffs have sufficiently alleged that USASF owed them a duty based on the third and fourth exceptions to the general "no duty to protect" rule.  See In re Blackbaud, 567 F. Supp. 3d at 682 (finding a duty where plaintiff consumers had alleged that defendant cloud software company knew of the risk of cyberattacks and the inadequacy of its systems yet "failed to correct, update, or upgrade its security protections").  The court further finds that Plaintiffs have sufficiently pled the breach, damages,

and causation elements of their gross-negligence and negligent-security claims. Thus, USASF's

motion to dismiss Counts IV and XI for failure to state a claim is denied.

### E. Negligent Supervision (Count V)

In Count V, Plaintiffs assert a claim for negligent supervision against USASF. Under

South Carolina law,

> an employer may be liable for negligent supervision if the employee intentionally
> harms another when the employee: (1) is upon the premises of the employer, or is
> using a chattel of the employer, (2) the employer knows or has reason to know that
> he has the ability to control his employee, and (3) the employer knows or should
> know of the necessity and opportunity for exercising such control.

Charleston v. Young Clement Rivers & Tisdale, LLP, 598 S.E.2d 717, 722-23 (S.C. Ct. App.

2004) (citing Degenhart v. Knights of Columbus, 420 S.E.2d 495, 496 (S.C. 1992)); see also

Restatement (Second) of Torts § 317.

A claim for negligent supervision is necessarily predicated on the existence of an

employment relationship. Degenhart, 420 S.E.2d at 496 ("An *employer* may be liable for

negligent supervision if the *employee* . . . ." (emphasis added)). Plaintiffs, however, do not

allege that any of the individual Defendants were employed by USASF. Rather, the amended

complaint reflects that Rockstar Cheer was a privately owned gym, (Am. Compl. ¶ 58, ECF No.

8), and that the alleged perpetrators of the abuse were Rockstar owners and employees, (Id.

21-28, ECF No. 8.) Therefore, because Plaintiffs have failed to allege the existence of an

employment relationship between USASF and the individual Defendants, the court grants

USASF's motion to dismiss Count V. Bank of N.Y. v. Sumter Cnty., 691 S.E.2d 473, 478 (S.C.

2010) (affirming summary judgment in favor of the South Carolina Judicial Department because

there was no evidence that a county's master-in-equity was employed by the Department).

33

### F. Breach of Contract (Count VIII)

To state a claim for breach of contract, Plaintiffs must allege "the existence of a contract, its breach, and damages caused by such breach."  Hotel & Motel Holdings, LLC v. BJC Enters., LLC, 780 S.E.2d 263, 272 (S.C. Ct. App. 2015) (internal quotation marks omitted).

Plaintiffs allege that they entered into annual membership agreements with USASF in which USASF "agreed to provide a competitive environment that was safe, secure, and free from harm, specifically physical and sexual abuse."  (Am. Compl. ¶ 421, ECF No. 8.)  Plaintiffs contend that USASF breached the "fundamental and material" terms of these agreements since they were subject to "severe and oppressive" physical and mental abuse by coaches affiliated with USASF-certified gyms and at competitions overseen by USASF.  (Id. ¶¶ 422-24, ECF No. 8.)

In response, USASF does not dispute that valid contracts existed between the parties. USASF instead submits that its investigatory obligations were not triggered until it received a report of abuse and that, because it promptly suspended the alleged abusers of the only Plaintiff who filed a report, no breach could have occurred.  (USASF's Mem. Supp. Mot. Dismiss 34-35, ECF No. 126-1.)  In advancing these arguments, USASF relies on its current Terms and Conditions for Athlete Membership and its current Code of Conduct & Compliance.  (Id. 34, ECF No. 126-1.)

Neither side, however, has proffered the memberships agreements that were in effect at the time Plaintiffs were allegedly abused.  Without those agreements, the court is left to speculate as to the "fundamental and material" terms that governed the parties' relationship. (Am. Compl. ¶ 424, ECF No. 8.)  As a result, the court finds that USASF's arguments related to

Plaintiffs' breach-of-contract claim are better suited for resolution at a later stage. USASF's

motion to dismiss Count VIII is denied.

### G. Unjust Enrichment (Count IX)

"A party may be unjustly enriched when it has and retains benefits or money which in

justice and equity belong to another." Dema v. Tenet Physician Services-Hilton Head, Inc., 678

S.E.2d 430, 434 (S.C. 2009). To recover for unjust enrichment, a plaintiff must show "(1) that

he conferred a non-gratuitous benefit on the defendant; (2) that the defendant realized some

value from the benefit; and (3) that it would be inequitable for the defendant to retain the benefit

without paying the plaintiff for its value." Sauner v. Pub. Serv. Auth., 581 S.E.2d 161, 167

(S.C. 2003).

USASF argues that because Plaintiffs have alleged the existence of a contract, their

unjust-enrichment claim necessarily fails as a matter of law. Turner v. Rams Head Co., No.

3:05-cv-02893-CMC, 2007 WL 2579386, at *7 (D.S.C. Sept. 4, 2007) (unpublished) ("[A]n

action for unjust enrichment cannot lie in the face of an express contract." (quoting 66

Am.Jur.2d Restitution and Implied Contracts § 24 (Thomson/West 2007)); Palmetto Health

Credit Union v. Open Sols. Inc., No. 3:08-cv-03848-CMC, 2010 WL 2710551, at *4 (D.S.C.

July 7, 2010) (unpublished) ("Recovery under a theory of unjust enrichment is available only

where the rights and responsibilities at issue are not governed by an express contract.").

Contrary to USASF's contention, however, the Federal Rules plainly allow parties to assert

inconsistent theories of recovery at the pleading stage. Fed. R. Civ. P. 8(d)(3) ("A party may

state as many separate claims . . . as it has, regardless of consistency.") Recognizing this, courts

in this district have refrained from dismissing properly pled unjust-enrichment claims asserted in

the alternative to claims for breach of contract.  E.g., Sandviks v. PhD Fitness, LLC, No.: 1:17-cv-00744-JMC, 2018 WL 1393745, at *6-7 (D.S.C. Mar. 20, 2018) (unpublished); Trevillyan v. APX Alarm Sec. Sys., Inc., No. 2:10-cv-01387-MBS, 2011 WL 11611, at *7 (D.S.C. Jan. 3, 2011) (unpublished).

This court will do the same.  Because Plaintiffs have sufficiently alleged that they conferred benefits on USASF through their payment of membership dues and that USASF retained those benefits under inequitable circumstances, the court denies USASF's motion to dismiss Plaintiffs' claim for unjust enrichment.

**H. Fraud (Count X)**

"Fraud is an intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to [a person] or to surrender a legal right." Regions Bank v. Schmauch, 582 S.E.2d 432, 444 (S.C. Ct. App. 2003).  To plead fraud under South Carolina law, a plaintiff must plausibly allege

> (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury.

Id. at 444-45.  "The failure to prove any element of fraud or misrepresentation is fatal to the claim." Schnellmann v. Roettger, 645 S.E.2d 239, 241 (S.C. 2007).

Along with pleading these elements, a party alleging fraud in federal court must also "state with particularity the circumstances constituting [the] fraud" under Federal Rule of Civil Procedure 9(b).  Those circumstances include "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he

36

obtained thereby," Edmonson v. Eagle Nat'l Bank, 922 F.3d 535, 553 (4th Cir. 2019) (internal

quotation marks omitted) – or more simply, "the who, what, when, where, and how of the

alleged fraud," United States ex rel. Taylor v. Boyko, 39 F.4th 177, 189 (4th Cir. 2022) (internal

quotation marks omitted).  "A lack of compliance with Rule 9(b)'s pleading requirements is

treated as failure to state a claim under Rule 12(b)(6)."  Id. (internal quotation marks omitted).

        Plaintiffs' fraud theory is that Defendants knowingly misrepresented the safety of their

competitions and affiliate gyms to entice Plaintiffs and their families to pay annual dues and

fees.  (Am. Compl. ¶¶ 435-36, 440-41, ECF No. 8.)  Plaintiffs argue their fraud claim should

survive dismissal because they have identified "numerous specific misrepresentations by

Defendant USASF about making All-star cheer safe for athletes, including misrepresentations

related to the safe[ty of] competition and gym environment[s], credentialing and certification of

gyms and coaches, and centralized reporting."  (Resp. Opp'n USASF Mot. Dismiss 32, ECF No.

144.)  The court disagrees.

        To begin, the amended complaint improperly relies on group pleading.  The eleven

paragraphs in Plaintiffs' fraud count contain only vague allegations, unattributed to any specific

Defendant.  (Am. Compl. ¶ 436, ECF No. 8) ("Defendants represented to Plaintiffs that . . . .");

(Id. ¶ 437, ECF No. 8) ("Defendants' promises . . . ."); (Id. ¶ 442, ECF No. 8) ("Defendants'

misrepresentations included . . . .").  Plaintiffs cannot satisfy Rule 9(b)'s heightened pleading

standard by "grouping defendants together" and failing to "specify[] which defendant committed

which wrong."  Toney v. Lasalle Bank Nat'l Ass'n, 896 F. Supp. 2d 455, 480 (D.S.C. 2012);

Ascente Bus. Consulting, LLC v. DR myCommerce, 9 F.4th 839, 845 (8th Cir. 2021) ("It is not

sufficient to attribute alleged false statements to 'defendants' generally.").

Even if the court were to consider Plaintiffs' RICO case statement in evaluating their fraud claim, Plaintiffs do not allege how any of the statements they attribute to USASF – USASF social media posts from August 2022 and representations from its website related to participant safety[10] – were demonstrably false at the time they were made.

_____

[10] These statements include, for example:

- "Athlete Safety is our #1 Priority!  Our mission includes 'strive for a safe environment for our athletes.'  To the USASF, safety extends beyond our Cheer or Dance safety rules for performance.  We're committed to helping our members create the safest overall environment for every All-Star athlete, so we've made resources available for use in gyms and studios."

- "Attend any USASF Sanctioned competition and find peace of mind knowing minimum safety standards will be met and the same rules and regulations will be followed every time, at every event, by ever[y] member. . . . USASF-sanctioned competitions have resources to provide the safest and healthiest competitive atmosphere and the best possible on and off the floor experiences for athletes."

- "Our purpose is to encourage a community and culture of health, safety, and excellence where Athletes and other participants can thrive. . . ."

- "From requiring background screenings for adults in All Star to creating and enforcing safety standards at all USASF Sanctioned Competitions and developing tools for clubs to train young athletes, the highest priority for the USASF is the safety and protection of athletes in All Star."

- "USASF is the U.S. All Star Federation.  It's about safety standards.  It's about coaches' education.  It's about providing a safe environment to allow for the continued growth of All-Star cheerleading and dance across the country.  It's about parents knowing their children are being taught using safe methods that are in accordance with the standard of care.  It's about standardization of rules from one competition to the next.  It's about time."

(RICO Case Statement 16, 29-32, ECF No. 38.)  Most of the statements constitute nonactionable puffery.  See CRC Scrap Metal Recycling, LLC v. Hartford Cas. Ins. Co., 531 F. App'x 333, 335 (4th Cir. 2013) (unpublished) ("An insurer's vague puffery that a policy provides the 'best and broadest' available coverage does not constitute a factual misrepresentation."); Doe v. Uber Techs., Inc., 551 F. Supp. 3d 341, 368 (S.D.N.Y. 2021) ("The language that Uber is 'committed' to connecting consumers to the 'safest ride on the road' is aspirational puffery."); In re Ford Motor Co. Securities Litig., Class Action, 381 F.3d 563, 570 (6th Cir. 2004) (statement that "Ford is a worldwide leader in automotive safety" not actionable).

Equally problematic, Plaintiffs' pleadings do not specify which, if any, of the Plaintiffs relied on USASF's representations in becoming USASF members. "How and whether a party relied on a misstatement is every bit as much 'circumstance[] constituting fraud' as any other element." Xia Bi v. McAuliffe, 927 F.3d 177, 185 (4th Cir. 2019) (affirming dismissal of fraud claim for failure to comply with Rule 9(b) where complaint "d[id] not state which of the named [p]laintiffs claims to have relied on each statement, or where or how any specific [p]laintiff heard or learned of the alleged statements"). Although Plaintiffs generally allege that they "had a right to rely upon Defendants' promises and did so rely," (Am. Compl. ¶ 438, ECF No. 8), that is merely a "formulaic recitation" of the seventh and eighth elements required for a fraud claim, Iqbal, 556 U.S. at 681; see Belvin v. Sedgewood Manor Health Care Cntr., LLC, No. 3:21-cv-02169-JMC, 2022 WL 845817, at *4 (D.S.C. Mar. 22, 2022) (unpublished) (dismissing fraud claim where plaintiff merely alleged that "Plaintiff and his family had a right to rely on the misrepresentations and concealments made by the defendant"). Similarly, Plaintiffs make the generalized claim that USASF's alleged misrepresentations about "the safety and security of their competitions and camps . . . lull[ed] *parents* into comfort," (Am. Compl. ¶ 68, ECF No. 8) (emphasis added), yet fail to identify any particular parent.

In short, Plaintiffs' failure to satisfy Rule 9(b)'s particularity requirement is fatal to their fraud claim. Count X is dismissed as to USASF.

### I. Civil Conspiracy (Count XII)

To state a civil-conspiracy claim, a plaintiff must allege four elements: "(1) the combination or agreement of two or more persons, (2) to commit an unlawful act or a lawful act by unlawful means, (3) together with the commission of an overt act in furtherance of the agreement, and (4) damages proximately resulting to the plaintiff." Paradis v. Charleston Cty.

Sch. Dist., 861 S.E.2d 774, 780 (S.C. 2021).  Because "civil conspiracy is an intentional tort, an

intent to harm . . . [is] an inherent part of th[is] analysis."  Id. at 780 n.9.  A plaintiff asserting a

civil-conspiracy claim must also allege acts "in furtherance of the conspiracy in a manner

separate and independent from [their] other causes of action."  Jinks v. Sea Pines Resort, LLC,

No. 9:21-cv-00138-DCN, 2021 WL 4711408, at *3 (D.S.C. Oct. 8, 2021) (unpublished).  Stated

another way, if "the particular acts charged as a conspiracy are the same as those relied on as the

tortious act or actionable wrong, plaintiff cannot recover damages for such act or wrong, and

recover likewise on the conspiracy to do the act or wrong."  Todd v. S.C. Farm Bureau Mut. Ins.

Co., 278 S.E.2d 607, 611 (S.C. 1981), overruled on other grounds by Paradis, 861 S.E.2d at 780.

Here, Plaintiffs have merely summarized the allegations underlying their other causes of

action and repackaged them into a claim for civil conspiracy.  Plaintiffs' civil-conspiracy claim

is the last count in their amended complaint.  (Am. Compl. ¶¶ 452-66, ECF No. 8.)  It

incorporates all preceding allegations and generally alleges that Defendants misrepresented the

safety of their gyms and competitions, failed to take appropriate action when faced with

allegations of abuse, and reaped substantial financial benefits in the form of dues and fees.  (Id.

¶¶ 452, 455-56, 461-62, 464-65, ECF No. 8.)  But because Plaintiffs have not identified

"additional acts in furtherance of the conspiracy separate and independent from other wrongful

acts alleged in [their] complaint," Hackworth v. Greywood at Hammett, LLC, 682 S.E.2d 871,

875 (S.C. Ct. App. 2009), overruled on other grounds by Paradis, 861 S.E.2d at 780, they have

failed to state a valid claim for civil conspiracy.  As a result, the court grants USASF's motion to

dismiss Count XII.

## V. CONCLUSION

For the reasons above, the court **GRANTS** USASF's motion to dismiss as to Count I (CAVRA), Count II (RICO), Count III (SCUTPA), Count V (negligent supervision), Count X (fraud), and Count XII (civil conspiracy), but **DENIES** USASF's motion as to Count IV (gross negligence), Count VIII (breach of contract), Count IX (unjust enrichment), and Count XI (negligent security).

It is therefore

**ORDERED** that USASF's motion to dismiss, document number 126, is granted in part and denied in part.

**IT IS SO ORDERED.**

s/Henry M. Herlong, Jr.
Senior United States District Judge

Greenville, South Carolina
June 21, 2023